69 A.3d 1149

**James K. COLEMAN**

v.

**SOCCER ASSOCIATION OF COLUMBIA, et al.**

**No. 9, Sept. Term, 2012.**

Court of Appeals of Maryland.

July 9, 2013.

John Vail (Center for Constitutional Litigation, P.C., Washington, D.C.), on brief, Bruce M. Plaxen (Plaxen & Adler, P.A., Columbia, MD; Lloyd J. Eisenberg of Lloyd J. Eisenberg & Associates P.A., Columbia, MD), on brief for Appellant/Cross–Appellee.

Wayne M. Willoughby (Gershon, Willoughby, Getz & Smith, LLC, Baltimore, MD), for Amicus Curiae brief of Professor Robert H. Lande in Support of Plaintiff–Petitioner.

Robert J. Zarbin (James K. MacAlister, Upper Marlboro, MD), for Amicus Curiae brief of Maryland Association for Justice in Support of Plaintiff–Petitioner.

Douglas W. Biser (Matthew P. Lalumia of Mudd, Harrison & Burch, L.L.P., Towson, MD), on brief for Appellees/Cross–Appellants.

M. Albert Figinski (Peter G. Angelos and Jeffrey J. Utermohle of Law Offices of Peter G. Angelos, P.C., Baltimore, MD—Brief of Amicus Curiae, Law Offices of Peter G. Angelos, P.C.), on brief, for Appellees/Cross–Appellants.

Gardner M. Duvall (Danielle G. Marcus, Peter W. Sheehan, Jr. of Whiteford, Taylor & Preston, L.L.P., Baltimore, MD), for Amicus Curiae brief of Maryland Defense Counsel.

Karen J. Kruger (David M. Funk of Funk & Bolton, P.A., Baltimore, MD), for Amici Curiae brief of Local Government Insurance Trust, Maryland Association of Counties, Maryland Municipal League, Mayor and City Council of Baltimore.

Paul A. Tiburzi (Carville B. Collins of DLA Piper LLP (US), Baltimore, MD), for Amici Curiae brief of the Maryland Chamber of Commerce and the Maryland Tort Reform Coalition in Support of Appellees.

Mark A. Behrens, Esquire, Christopher E. Appel, Esquire, Shook, Hardy & Bacon L.L.P., Washington, D.C., for Amici Curiae brief of the American Tort Reform Association, Chamber of Commerce of the United States of America, Coalition for Litigation Justice, Inc., American Insurance Association, Property Casualty Insurers Association of America, National Association of Mutual Insurance Companies, Physician Insurers Association of America, American Medical Association, and

NFIB Small Business Legal Center in Support of Respondents.

Argued before BELL, C.J.,* HARRELL, BATTAGLIA, GREENE, McDONALD, JOHN C. ELDRIDGE (Retired, Specially Assigned) and IRMA S. RAKER (Retired, Specially Assigned) JJ.

ELDRIDGE, J.

Thirty years ago, in *Harrison v. Montgomery County Bd. of Educ.*, 295 Md. 442, 444, 456 A.2d 894 (1983), this Court issued a writ of certiorari to decide "whether the common law doctrine of contributory negligence should be judicially abrogated in Maryland and the doctrine of comparative negligence adopted in its place as the rule governing trial of negligence actions in this State." In a comprehensive opinion by then Chief Judge Robert C. Murphy, the Court in *Harrison*, 295 Md. at 463, 456 A.2d at 905, declined to abandon the doctrine of contributory negligence in favor of comparative negligence, pointing out that such change "involves fundamental and basic public policy considerations properly to be addressed by the legislature."

The petitioner in the case at bar presents the same issue that was presented in *Harrison*, namely whether this Court should change the common law and abrogate the defense of contributory negligence in certain types of tort actions. After reviewing the issue again, we shall arrive at the same conclusion that the Court reached in *Harrison*.

I.

The petitioner and plaintiff below, James Kyle Coleman, was an accomplished soccer player who had volunteered to assist in coaching a team of young soccer players in a program of the Soccer Association of Columbia, in Howard County, Maryland. On August 19, 2008, Coleman, at the time 20 years old, was assisting the coach during the practice of a team of young soccer players on the field of the Lime Kiln Middle

---

* Bell, C.J., participated in the hearing of this case, in the conference in regard to its decision and in the adoption of the opinion, but he had retired from the Court prior to the filing of the opinion.

School. While the Soccer Association of Columbia had fields of its own, it did not have enough to accommodate all of the program's young soccer players; the Association was required to use school fields for practices. At some point during the practice, Coleman kicked a soccer ball into a soccer goal. As he passed under the goal's metal top rail, or crossbar, to retrieve the ball, he jumped up and grabbed the crossbar. The soccer goal was not anchored to the ground, and, as he held on to the upper crossbar, Coleman fell backwards, drawing the weight of the crossbar onto his face. He suffered multiple severe facial fractures which required surgery and the placing of three titanium plates in his face. Coleman instituted the present action by filing a complaint, in the Circuit Court for Howard County, alleging that he was injured by the defendants' negligence.[1] The defendant and respondent, the Soccer Association of Columbia, asserted the defense of contributory negligence.

At the ensuing jury trial, the soccer coach who had invited Coleman to help coach the soccer players testified that he had not inspected or anchored the goal which fell on Coleman. The coach also testified that the goal was not owned or provided by the Soccer Association, and he did not believe that it was his responsibility to anchor the goal. During the trial, the parties disputed whether the goal was located in an area under the supervision and control of the Soccer Association and whether the Soccer Association was required to inspect and anchor the goal. The Soccer Association presented testimony tending to show that, because the goal was not owned by the Soccer Association, the Soccer Association owed no

---

1. In his first amended complaint, Coleman named four defendants: the Soccer Association of Columbia, the Columbia Soccer Club, the Howard County Government, and the Howard County Board of Education. On August 16, 2010, Coleman filed a notice of voluntary dismissal as to the Howard County Government. Subsequently, on October 5, 2011, the parties stipulated to dismissal with prejudice of the Columbia Soccer Club. On October 24, 2011, the Howard County Board of Education was also dismissed with prejudice from the suit, leaving the Soccer Association of Columbia as the sole remaining defendant during the trial.

duty to Coleman. The Soccer Association also presented testimony that the condition of the goal was open and obvious to all persons. The Association maintained that the accident was caused solely by Coleman's negligence.

Testimony was provided by Coleman to the effect that players commonly hang from soccer goals and that his actions should have been anticipated and expected by the Soccer Association. Coleman also provided testimony that anchoring goals is a standard safety practice in youth soccer.

At the close of evidence, Coleman's attorney proffered a jury instruction on comparative negligence.[2] The judge declined to give Coleman's proffered comparative negligence instruction and, instead, instructed the jury on contributory negligence.

The jury was given a verdict sheet posing several questions. The first question was: "Do you find that the Soccer Association of Columbia was negligent?" The jury answered "yes" to this question. The jury also answered "yes" to the question: "Do you find that the Soccer Association of Columbia's negligence caused the Plaintiff's injuries?" Finally, the jury answered "yes" to the question: "Do you find that the Plaintiff was negligent and that his negligence contributed to his claimed injuries?"

In short, the jury concluded that the Soccer Association of Columbia was negligent and that the Soccer Association's negligence caused Coleman's injuries. The jury also found that Coleman was negligent, and that his negligence contributed to his own injuries. Because of the contributory negligence

---

**2.** The proffered jury instruction read as follows:

"**A. Comparative Negligence—Liability**

"If you find that more than one party has established his/her burden of proof as to negligence, as defined by the court, you must then compare the negligence of those parties. The total amount of negligence is 100%. The figure that you arrive at should reflect the total percentage of negligence attributed to each party with respect to the happening of the accident. A comparison of negligence is made only if the negligence of more than one party proximately caused the accident."

finding, Coleman was barred from any recovery. The trial court denied Coleman's motion for judgment notwithstanding the verdict and subsequently entered judgment in favor of the Soccer Association of Columbia.

Coleman filed a notice of appeal, and the Soccer Association filed a notice of cross-appeal.[3] Before briefing and argument in the Court of Special Appeals, Coleman filed in this Court a petition for a writ of certiorari, which was granted. *Coleman v. Soccer Ass'n of Columbia,* 425 Md. 396, 41 A.3d 570 (2012). In his petition, Coleman posed only one question: whether this Court should retain the standard of contributory negligence as the common law standard governing negligence cases in the State of Maryland.

We shall hold that, although this Court has the authority to change the common law rule of contributory negligence, we decline to abrogate Maryland's long-established common law principle of contributory negligence.

## II.

This Court last addressed the continuing viability of the contributory negligence doctrine in *Harrison v. Montgomery County Bd. of Educ., supra,* 295 Md. 442, 456 A.2d 894. In *Harrison,* the Court held that the contributory negligence principle remained the valid standard in Maryland negligence cases and that "any change in the established doctrine [was for] the Legislature." 295 Md. at 463, 456 A.2d at 905.

---

**3.** The Soccer Association's cross-appeal was unnecessary, and actually improper, because of the principle that a litigant is not entitled to appeal from a judgment wholly in his or her favor. Any arguments seeking to uphold the judgment on grounds rejected by the trial judge or jury, such as the alleged lack of primary negligence, can be made by the appellee under the principle that a judgment can be upheld on any ground adequately shown by the record. *See, e.g., Unger v. State,* 427 Md. 383, 400–401 n. 8, 48 A.3d 242, 252 n. 8 (2012); *Rush v. State,* 403 Md. 68, 103, 939 A.2d 689, 709 (2008); *Bowen v. Annapolis,* 402 Md. 587, 618, 937 A.2d 242, 260 (2007); *Wolfe v. Anne Arundel County,* 374 Md. 20, 25 n. 2, 821 A.2d 52, 55 n. 2 (2003).

Chief Judge Murphy, for the Court in *Harrison*, began his review of the contributory negligence standard by tracing the standard's historical origins to Lord Chief Justice Ellenborough's opinion in *Butterfield v. Forrester*, 11 East 60, 103 Eng. Rep. 926 (K.B. 1809).[4] As *Harrison* explained the case,

> "Butterfield left a public inn at dusk, mounted his horse and rode off 'violently' down the street. Forrester, who was effecting some repairs to his house, had placed a pole in the roadway. Although Butterfield could have seen and avoided the obstruction, he did not and was injured. The [English] court there noted:
>
>> 'One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff.' [11 East] at 61, 103 Eng. Rep. at 927."

The *Harrison* opinion explained that, when the contributory negligence standard was first judicially adopted in the United States, the courts at the time were concerned that juries would award to plaintiffs sums that had the potential to stifle "newly developing industry."[5] Early American courts were

---

**4.** Some commentators have claimed that the doctrine of contributory negligence originated even earlier, with the case of *Bayly v. Merrel*, 79 Eng. Rep. 331 (K.B. 1606). Most authorities, however, take the position that the doctrine originated with *Butterfield v. Forrester*, 11 East 60, 103 Eng. Rep. 926 (K.B. 1809). *See, e.g.*, William L. Prosser, *Comparative Negligence*, 41 Cal. L.Rev. 1, 3 (1953); Wex S. Malone, *The Formative Era of Contributory Negligence*, 41 Ill. L.Rev. 151 (1946).

**5.** One commentator has written as follows (H. Woods, *The Negligence Case: Comparative Fault*, § 1:4, at 7–8 (1978), footnotes omitted):

> "By 1850, [the country] had become heavily industrialized. This unprecedented development of industry and the general realization that it was related to Britain's continuance as the dominant world power brought out the protective instincts of her judiciary. The English courts eagerly seized upon Lord Ellenborough's holding in *Butterfield* as a most effective protective device. The American judiciary was no less enthusiastic. A Pennsylvania court in 1854 said this had been the 'rule from time immemorial and is not likely to be changed in all the time to come.' "

also concerned that they should not adopt a policy in which "courts ... assist a wrongdoer who suffered an injury as a result of his own wrongdoing." *Harrison*, 295 Md. at 450, 456 A.2d at 898. *See also Smith v. Smith*, 2 Pick. 621, 19 Mass. 621, 624 (1824) (a leading early American case incorporating the contributory negligence bar as part of common law).

This Court, relying on *Butterfield v. Forrester*, *supra*, first adopted the standard of contributory negligence in *Irwin v. Sprigg*, 6 Gill. 200, 205 (1847), stating:

> "The established doctrine now is, that although the defendant's misconduct may have been the primary cause of the injury complained of, yet the plaintiff cannot recover in an action of this kind, if the proximate and immediate cause of the damage can be traced to a want of ordinary care and caution on his part. Under such circumstances he must bear the consequences of his own recklessness or folly."

The contributory negligence standard was later modified in part by this Court's adoption of the last clear chance doctrine, *see N. C. R.R. Co. v. State, Use of Price*, 29 Md. 420, 436 (1868), which allowed a plaintiff to recover "if the defendant might, by the exercise of care on its part, have avoided the consequences of the neglect or carelessness" of the plaintiff.

---

*See also Alvis v. Ribar*, 85 Ill.2d 1, 6, 52 Ill.Dec. 23, 421 N.E.2d 886, 888 (1981):
> "Judicial concern was particularly evident in the area of personal injury suits by railroad employees against the railroads. The courts realized that, in the pervading public view that saw railroads as 'harmful entities with deep pockets'..., juries' sympathies toward plaintiffs could wreak financial disaster upon that burgeoning industry."

In 1906, Congress enacted the Federal Employers' Liability Act ("FELA"), 45 U.S.C. §§ 51–60, which applied a comparative negligence standard in cases brought by railroad workers against their employers. The statute states that the "liability of common carriers by railroad," is that "[e]very common carrier by railroad ... shall be liable in damages to any person suffering injury while he is employed by such carrier...." 45 U.S.C. § 51. The FELA specifies that "contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." 45 U.S.C. § 53. *See Collins v. National R.R. Passenger Corp.*, 417 Md. 217, 9 A.3d 56 (2010).

The Court recognized another exception to the contributory negligence standard where the plaintiff is under five years old. *See Taylor v. Armiger*, 277 Md. 638, 358 A.2d 883 (1975).

The *Harrison* Court examined the origins and impact of comparative negligence, noting that early in the 20th century, the Maryland General Assembly had adopted a form of comparative negligence for "certain perilous occupations," but had subsequently repealed the provisions. The Court in *Harrison* also pointed out that, as of 1983, of the thirty-nine states that had adopted comparative negligence, thirty-one had done so by statute, with the eight remaining states having adopted the principle by judicial action. The Court noted that it was "clear" that legal scholars "favored" the comparative negligence standard, as supported by "[a]n almost boundless array of scholarly writings." 295 Md. at 453, 456 A.2d at 899.

Nevertheless, the *Harrison* Court pointed to other considerations involved in changing the standard from contributory negligence to comparative negligence (295 Md. at 454–455, 456 A.2d at 900–901):

"Also to be considered is the effect which a comparative fault system would have on other fundamental areas of negligence law. The last clear chance doctrine, assumption of the risk, joint and several liability, contribution, setoffs and counterclaims, and application of the doctrine to other fault systems, such as strict liability in tort, are several of the more obvious areas affected by the urged shift to comparative negligence. Even that change has its complications; beside the 'pure' form of comparative negligence, there are several 'modified' forms, so that abrogation of the contributory negligence doctrine will necessitate the substitution of an alternate doctrine. Which form to adopt presents its own questions and the choice is by no means clear.... That a change from contributory to comparative negligence involves considerably more than a simple common law adjustment is readily apparent."

*Harrison* also examined those states which had abrogated the contributory negligence standard, pointing out that "most

of the states which have adopted comparative negligence have done so by statute in derogation of the common law." 295 Md. at 456, 456 A.2d at 901. The Court observed that, in several of these states, the courts had refused to judicially abrogate the contributory negligence standard because they "expressly deferred on policy grounds to their respective legislatures." 295 Md. at 456, 456 A.2d at 901. Only eight state supreme courts, as of 1983, had adopted a comparative negligence standard by judicial decision.

The *Harrison* opinion further held that, when this Court is "called upon, as here, to overrule our own decisions, consideration must be given to the doctrine of *stare decisis*—the policy which entails the reaffirmation of a decisional doctrine of an appellate court, even though if considered for the first time, the Court might reach a different conclusion. *Deems v. Western Maryland Ry.,* 247 Md. 95, 231 A.2d 514 (1966)." 295 Md. at 458, 456 A.2d at 902.

Chief Judge Murphy in *Harrison* continued his assessment by explaining that the principle of *stare decisis* should not be construed to

"inhibit [this Court] from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge, that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." (295 Md. at 459, 456 A.2d at 903).

Nevertheless, *Harrison* concluded (295 Md. at 459, 456 A.2d at 903):

"[I]n considering whether a long-established common law rule—unchanged by the legislature and thus reflective of this State's public policy—is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly; that body, by Article 5 of the Maryland Declaration of Rights, is expressly empowered to revise the common law of Maryland by legislative enactment. *See Felder v. Butler,* 292 Md. [174], 183, 438 A.2d

494 [499]; *Adler v. American Standard Corp.*, 291 Md. [31], 45, 432 A.2d 464 [472]. The Court, therefore, has been particularly reluctant to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State. *See, e.g., Condore v. Prince George's Co.*, 289 Md. [516] 532, 425 A.2d 1011 [1019]."

In the years immediately prior to *Harrison*, from 1966 to 1982, the Maryland General Assembly had considered twenty-one bills seeking to change the contributory negligence standard. None of the bills had been enacted. The *Harrison* Court accorded a great deal of weight to the General Assembly's failure to enact any of these bills, stating:

> "[T]he legislature's action in rejecting the proposed change is indicative of an intention to retain the contributory negligence doctrine." 295 Md. at 462, 456 A.2d at 904.

The Court further pointed out that enactment of a comparative negligence standard is not a single issue; instead, such a decision would encompass a variety of choices to be made, beginning with the initial inquiry of what form of comparative negligence to adopt, "pure" or one "of the several types of modified comparative negligence," 295 Md. at 462–463, 456 A.2d at 904. If Maryland's common law were to change, the *Harrison* opinion explained, the decision as to which form of comparative negligence to adopt "plainly involves major policy considerations" of the sort best left to the General Assembly. 295 Md. at 462, 456 A.2d at 904.

### III.

Since the time of *Harrison*, this Court has continued to recognize the standard of contributory negligence as the applicable principle in Maryland negligence actions. *See, e.g., Thomas v. Panco Management of Maryland, LLC*, 423 Md. 387, 417, 31 A.3d 583, 601 (2011); *Erie Insurance Exchange v. Heffernan*, 399 Md. 598, 925 A.2d 636 (2007); *Dehn v. Edgecombe*, 384 Md. 606, 865 A.2d 603 (2005); *Franklin v. Morrison*, 350 Md. 144, 168, 711 A.2d 177, 189 (1998); *County Commissioners v. Bell Atlantic*, 346 Md. 160, 695 A.2d 171 (1997); *Brady v. Parsons Co.*, 327 Md. 275, 609 A.2d 297

(1992); *Wegad v. Howard Street Jewelers,* 326 Md. 409, 605 A.2d 123 (1992); *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 495 A.2d 838 (1985).

Although the contributory negligence principle has been part of this State's common law for over 165 years, petitioners and numerous amici in this case urge this Court to abolish the contributory negligence standard and replace it with a form of comparative negligence. They argue contributory negligence is an antiquated doctrine, that it has been roundly criticized by academic legal scholars, and that it has been rejected in a majority of our sister states. It is also pointed out that contributory negligence works an inherent unfairness by barring plaintiffs from any recovery, even when it is proven, in a particular case, that a defendant's negligence was primarily responsible for the act or omission which resulted in a plaintiff's injuries. It is said that contributory negligence provides harsh justice to those who may have acted negligently, in minor ways, to contribute to their injuries, and that it absolves those defendants from liability who can find any minor negligence in the plaintiffs' behavior.

Petitioner correctly contends that, because contributory negligence is a court-created principle, and has not been embodied in Maryland statutes, this Court possesses the authority to change the principle. This Court has recognized that (*Ireland v. State,* 310 Md. 328, 331–332, 529 A.2d 365, 366 (1987)),

"[b]ecause of the inherent dynamism of the common law, we have consistently held that it is subject to judicial modification in light of modern circumstances or increased knowledge. *Harris v. State,* 306 Md. 344, 357, 509 A.2d 120 (1986); *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 497 A.2d 1143 (1985). Equally well established is the principle that the common law should not be changed contrary to the public policy of this State set forth by the General Assembly. *Kelley, supra,* 304 Md. at 141, 497 A.2d [at 1151]; *Harrison v. Mont. Co. Bd. of Educ.,* 295 Md. 442, 460–61, 456 A.2d 894 [903] (1983). In the area of civil common law this Court has not only modified the existing law but also

added to the body of law by recognizing new causes of action. *Kelley, supra,* (recognizing cause of action against manufacturers or marketers for damages caused by 'Saturday Night Special' handguns); *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983) (permitting negligence action by one spouse against another); *Moxley v. Acker,* 294 Md. 47, 447 A.2d 857 (1982)(deleting force as a required element of the action of forceable detainer); *Adler v. American Standard Corp.,* 291 Md. 31, 432 A.2d 464 (1981) (recognizing tort of abusive or wrongful discharge); *Lusby v. Lusby,* 283 Md. 334, 390 A.2d 77 (1978) (abolishing the defense of interspousal immunity in the case of outrageous intentional torts); *Harris v. Jones,* 281 Md. 560, 380 A.2d 611 (1977) (recognizing tort of intentional infliction of emotional distress)."

The Court's ability to modify the common law was further underscored in *Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 140, 497 A.2d 1143, 1151 (1985):

"This Court has repeatedly said that 'the common law is not static; its life and heart is its dynamism—its ability to keep pace with the world while constantly searching for just and fair solutions to pressing societal problems.' *Harrison v. Mont. Co. Bd. of Educ.,* 295 Md. 442, 460, 456 A.2d 894 (1983). *See Felder v. Butler,* 292 Md. 174, 182, 438 A.2d 494 (1981). The common law is, therefore, subject to judicial modification in light of modern circumstances or increased knowledge. *Jones v. State,* 302 Md. 153, 161, 486 A.2d 184 (1985); *Boblitz v. Boblitz,* 296 Md. 242, 462 A.2d 506 (1983); *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981)."

*See also, e.g., Bowden v. Caldor,* 350 Md. 4, 710 A.2d 267 (1998)("as often pointed out, this Court has authority under the Maryland Constitution to change the common law"); *Telnikoff v. Matusevitch,* 347 Md. 561, 593 n. 29, 702 A.2d 230, 246 n. 29 (1997); *Owens–Illinois v. Zenobia,* 325 Md. 420, 469–470, 601 A.2d 633, 657 (1992).

Since the *Harrison* case, the General Assembly has continually considered and failed to pass bills that would abolish or modify the contributory negligence standard.[6] The failure of so many bills, attempting to change the contributory negligence doctrine, is a clear indication of legislative policy at the present time. This Court in *Moore v. State,* 388 Md. 623, 641, 882 A.2d 256, 267 (2005), with regard to the failure of legislation, explained:

"Although the failure of a single bill in the General Assembly may be due to many reasons, and thus is not always a good indication of the Legislature's intent, under some circumstances, the failure to enact legislation is persuasive evidence of legislative intent. *See, e.g., Lee v. Cline,* 384 Md. 245, 255–256, 863 A.2d 297, 303–304 (2004); *Arundel Corp. v. Marie,* 383 Md. 489, 504, 860 A.2d 886, 895 (2004) ('The Legislature [has] declined invitations to modify the rule as [appellant] wishes'); *Stearman v. State Farm,* 381 Md. 436, 455, 849 A.2d 539, 550–551 (2004) ('The refusal of the Legislature to act to change a [statute] . . . provides . . . support for the Court to exercise restraint and refuse to step in and make the change'); *In re Anthony R., supra,* 362 Md. [51], 65–67, 763 A.2d [136], 144–145 (2000); *State v. Sowell,* 353 Md. 713, 723–724, 728 A.2d 712, 717–718 (1999) ('We have recognized that the General Assembly's failure to amend . . . sometimes reflects its desired public policy'); *State v. Bell,* 351 Md. 709, 723, 720 A.2d 311, 318 (1998) ('Therefore, by declining to adopt the proposed language of the amending bill, the Legislature clearly did not intend' to

---

**6.** *See, e.g.,* House Bill 836 of the 1996 session (withdrawn); House Bill 846 of the 1997 session (unfavorable report of the House Judiciary Committee); Senate Bill 618 of the 1998 Session (unfavorable report of the Senate Judicial Proceedings Committee); House Bill 551 of the 1999 Session (unfavorable report of the House Judiciary Committee); Senate Bill 779 of the 2000 Session (unfavorable report of the Senate Judicial Proceedings Committee); Senate Bill 483 of the 2001 Session (unfavorable report of the Senate Judicial Proceedings Committee); Senate Bill 872 of the 2002 Session (sent to Senate Rules Committee but no further progress); House Bill 110 of the 2007 Session (withdrawn); Senate Bill 267 of the 2007 Session; House Bill 1129 of the 2011 Session.

adopt the result being urged); *State v. Frazier,* 298 Md. 422, 459, 470 A.2d 1269, 1288 (1984) ('All of these proposals [supporting different views of a statute advocated by the parties] were rejected by the General Assembly')."

The *Moore* opinion continued (388 Md. at 641–642, 882 A.2d at 267):

"Legislative inaction is very significant where bills have repeatedly been introduced in the General Assembly to accomplish a particular result, and where the General Assembly has persistently refused to enact such bills. *See, e.g., Arundel Corp. v. Marie, supra,* 383 Md. at 502–504, 860 A.2d at 894–896; *Stearman v. State Farm, supra,* 381 Md. at 455, 849 A.2d at 551 ('Every year since 2000, legislators have introduced bills in the General Assembly that would' accomplish what the appellant urges, but '[n]one of these bills were enacted'); *Bozman v. Bozman,* 376 Md. 461, 492, 830 A.2d 450, 469 (2003), quoting *Boblitz v. Boblitz,* 296 Md. 242, 274, 462 A.2d 506, 521 (1983) (The Court will decline to adopt a particular position 'where the Legislature repeatedly had rejected efforts to achieve legislatively that which we were asked to grant judicially'); *Halliday v. Sturm,* 368 Md. 186, 209, 792 A.2d 1145, 1159 (2002) (The Court refused to adopt positions 'that have been presented on several occasions to the General Assembly' and '[s]o far, the Legislature has chosen not' to adopt them). . . ."

*See also Potomac Valley Orth. v. Board of Physicians,* 417 Md. 622, 640–641, 12 A.3d 84, 95 (2011).

The General Assembly's repeated failure to pass legislation abrogating the defense of contributory negligence is very strong evidence that the legislative policy in Maryland is to retain the principle of contributory negligence. Chief Judge Bell emphasized for the Court in *Baltimore v. Clark,* 404 Md. 13, 36, 944 A.2d 1122, 1135–1136 (2008), the following:

"It is well settled that, where the General Assembly has announced public policy, the Court will decline to enter the public policy debate, even when it is the common law that is at issue and the Court certainly has the authority to change

the common law. *Adler v. American Standard Corp.,* 291 Md. at 47, 432 A.2d at 473."

*See Ireland v. State, supra,* 310 Md. at 331, 529 A.2d at 366 ("[T]he common law should not be changed contrary to the public policy of the State as set forth by the General Assembly"); *Kelley v. R.G. Industries, supra,* 304 Md. at 141, 497 A.2d at 1151 ("[W]e have consistently recognized that common law principles should not be changed contrary to the public policy of the State set forth by the General Assembly").

For this Court to change the common law and abrogate the contributory negligence defense in negligence actions, in the face of the General Assembly's repeated refusal to do so, would be totally inconsistent with the Court's long-standing jurisprudence.

*JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT JAMES COLEMAN.*

BELL, C.J. and HARRELL, J., dissent.

BATTAGLIA, GREENE, McDONALD and RAKER, JJ. Concur.

HARRELL, J., dissenting, which BELL, C.J., joins.

Paleontologists and geologists inform us that Earth's Cretaceous period (including in what is present day Maryland) ended approximately 65 million years ago with an asteroid striking Earth (the Cretaceous–Paleogene Extinction Event), wiping-out, in a relatively short period of geologic time, most plant and animal species, including dinosaurs. As to the last premise, they are wrong. A dinosaur roams yet the landscape of Maryland (and Virginia, Alabama, North Carolina and the District of Columbia), feeding on the claims of persons injured by the negligence of another, but who contributed proximately in some way to the occasion of his or her injuries, however slight their culpability. The name of that dinosaur is the doctrine of contributory negligence. With the force of a modern asteroid strike, this Court should render, in the

present case, this dinosaur extinct. It chooses not to do so. Accordingly, I dissent.

My dissent does not take the form of a tit-for-tat trading of thrusts and parries with the Majority opinion. Rather, I write for a future majority of this Court, which, I have no doubt, will relegate the fossilized doctrine of contributory negligence to a judicial tar pit at some point.

I. The History of Contributory Negligence in Maryland

Under the doctrine of contributory negligence, a plaintiff who fails to exercise ordinary care for his or her own safety, and thus contributes proximately to his or her injury, "is barred from all recovery, regardless of the quantum of a defendant's primary negligence." *Harrison v. Montgomery Cnty. Bd. of Ed.*, 295 Md. 442, 451, 456 A.2d 894, 898 (1983). Contributory negligence is the "neglect of duty imposed upon all men to observe ordinary care for their own safety," *Potts v. Armour & Co.*, 183 Md. 483, 490, 39 A.2d 552, 556 (1944), and refers not to the breach of a duty owed to another, but rather to the failure of an individual to exercise that degree of care necessary to protect him or her self. *Baltimore Cnty. v. State, Use of Keenan*, 232 Md. 350, 362, 193 A.2d 30, 37 (1963). An "all-or-nothing" doctrine, contributory negligence operates in application as a total bar to recovery by an injured plaintiff.

The doctrine is of judicial "Big Bang" origin, credited generally to the 1809 English case of *Butterfield v. Forrester* (1809) 103 Eng. Rep. 926 (K.B.). In *Butterfield,* the court considered whether a plaintiff, injured while "violently" riding his horse on a roadway, by a pole negligently placed in the roadway, could recover damages. Denying recovery, Lord Ellenborough penned the first recognized incantation of contributory negligence, declaring, "One person being in fault will not dispense with another's using ordinary care for himself. Two things must concur to support this action, an obstruction in the road by the fault of the defendant, and no want of ordinary care to avoid it on the part of the plaintiff." *Id.* at 927.

Soon after *Butterfield,* American courts began to recognize the doctrine of contributory negligence. *See Smith v. Smith,* 19 Mass. (2 Pick.) 621 (1824); William L. Prosser, *Comparative Negligence,* 51 Mich. L.Rev. 465, 468 (1953). Although early courts explained rarely the reasons for their adoption of the doctrine, scholars set forth later multiple reasons for its widespread acceptance in the U.S. in the nineteenth and early twentieth centuries. For example, its ascendance was considered a means of encouraging potential plaintiffs to comply with the relevant standard of care, 4 Harper, James & Gray on Torts, § 22.2 at 340 (3d ed. 2006) (hereinafter "Harper, James & Gray"); requiring plaintiffs to enter court with clean hands, Prosser & Keeton on the Law of Torts, § 65 at 451 (5th ed. 1984) (hereinafter "Prosser & Keeton"); and, insulating developing industry from liability and fostering economic growth by keeping in check plaintiff-minded juries. *Id.* at 452; 4 Harper, James & Gray, *supra,* § 22.1 at 328–30. The doctrine was seen also as consistent with "several unwritten policies of the [nineteenth and early twentieth century] common law"—specifically, the idea that courts should not assist someone who contributes to causing his or her own injuries, and the "passion for a simple issue that could be categorically answered yes or no . . ." *Harrison,* 295 Md. at 450, 456 A.2d at 897–98; *see also* Edward S. Digges, Jr. & Robert Dale Klein, *Comparative Fault in Maryland: The Time Has Come,* 41 Md. L.Rev. 276, 278 (1982); Prosser & Keeton, *supra,* § 65 at 452.

Whatever the initial justifications attributed to its birth, contributory negligence has been a mainstay of Maryland law since its adoption in *Irwin v. Sprigg,* 6 Gill 200 (1847).[1] Since

---

1. The Court in *Irwin* stated, in Maryland's seminal invocation of contributory negligence, that it is

    established doctrine . . . that although the defendant's misconduct may have been the primary cause of the injury complained of, . . . the plaintiff cannot recover in a[ negligence action] if the proximate and immediate cause of the damage can be traced to a want of ordinary care and caution on his part. Under such circumstances, he must bear the consequences of his own recklessness or folly.

that time, Maryland courts applied the doctrine of contributory negligence to bar recovery in negligence actions by at-fault plaintiffs. Exceptions evolved, however, to allow recovery in specific instances. For example, the defense of contributory negligence is not available against claimants under five years of age, *Taylor v. Armiger,* 277 Md. 638, 649, 358 A.2d 883, 889 (1976), in strict liability actions, *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 597, 495 A.2d 348, 356 (1985), and in actions based on intentional conduct, *Tucker v. State, Use of Johnson,* 89 Md. 471, 486, 43 A. 778, 783 (1899); *State Farm Mut. Auto. Ins. Co. v. Hill,* 139 Md.App. 308, 316–18, 775 A.2d 476, 481–82 (2001). Additionally, the doctrine of last clear chance developed, *Northern Cent. Ry. Co. v. State, Use of Price,* 29 Md. 420, 436 (1868), to allow a plaintiff to recover, despite his or her contributory negligence, if he or she establishes "something new or sequential, which affords the defendant a fresh opportunity (of which he fails to avail himself) to avert the consequences of his original negligence." [2] *Sanner v. Guard,* 236 Md. 271, 276, 203 A.2d 885, 888 (1964).

The all-or-nothing consequences of the application of contributory negligence have long been criticized nationally by scholars and commentators. *See, e.g., Hilen v. Hays,* 673 S.W.2d 713, 717 (Ky.1984) ("A list of the critics of contributory negligence as a complete bar to a plaintiff's recovery reads like a tort hall of fame. The list includes, among others, Campbell, Fleming, Green, Harper and James, Dreton, Leflar, Malone, Pound and Prosser."); Prosser, *Comparative Negligence, supra,* at 469 ("Criticism of the denial of recovery was

6 Gill at 205.

**2.** As this Court acknowledged in *Harrison,* the creation of the doctrine of last clear change is attributed generally to an attempt to alleviate the harsh results of the doctrine of contributory negligence. 295 Md. at 450, 456 A.2d at 898. Despite general scholarly agreement with this principle, *see, e.g.,* Digges & Klein, *supra,* at 276; Prosser & Keeton, *supra,* at 464 ("The real explanation [for the doctrine of last clear chance] would seem to be a fundamental dislike for the harshness of the contributory negligence defense."), the *Harrison* court stated that "[n]othing in [the adopting case] lends any direct support to this hypothesis." 295 Md. at 450–51, 456 A.2d at 898.

not slow in coming, and it has been with us for more than a century."); 2 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts, § 218 at 763 (2d ed. 2011) (hereinafter "Dobbs") ("The traditional contributory negligence rule was extreme not merely in results but in principle. No satisfactory reasoning has ever explained the rule."). Many have argued instead for, and most states have adopted,[3] a system of comparative negligence which apportions damages between a negligent plaintiff and a negligent defendant according to each party's relative degree of fault. Thus, under a comparative negligence system, a plaintiff's contributory negligence does not bar recovery, but rather reduces proportionately his or her damages in relation to his or her degree of fault.[4] 2 Dobbs, *supra*, § 220 at 771.

This Court considered previously whether to replace the common law doctrine of contributory negligence with a system of comparative fault. *See Harrison*, 295 Md. 442, 456 A.2d 894; *Pittsburg & Connellsville R.R. Co. v. Andrews*, 39 Md. 329, 351 (1874) (noting that a doctrine requiring the relative fault of a plaintiff and defendant to be compared "has never been sanctioned in this State, but the exact contrary is the settled rule here"). We confronted this question most recently nearly thirty years ago. In *Harrison*, we considered

---

3. Comparative negligence (in one form or another) is applied in the United States overwhelmingly, with forty-six states abandoning contributory negligence in favor of comparative fault. Only four states— Alabama, Maryland, North Carolina, and Virginia—and the District of Columbia continue to apply contributory negligence in its traditional guise. 2 Dobbs, *supra*, § 220 at 771–72.

4. Comparative fault comes in two main forms: pure and modified. Under a pure comparative fault system, a contributorily negligent claimant's damages will be reduced based purely on his or her degree of fault (expressed as relative percentages of 100%), regardless of whether the claimant is as much or more at fault than the defendant. 4 Harper, James & Gray, *supra*, § 22.15 at 458; Prosser & Keeton, *supra*, § 67 at 471–72. A modified comparative fault system, by contrast, prohibits a claimant from recovering any damages if his or her relative degree of fault exceeds a certain threshold. 4 Harper, James & Gray, *supra*, § 22.15 at 458; Prosser & Keeton, *supra*, § 67 at 473. I will discuss *infra* in more detail the various forms of comparative fault.

whether to abrogate judicially contributory negligence in the midst of a nation-wide movement to transition to a system of comparative fault.[5] We engaged first in a comparison of the historical and doctrinal principles of both contributory and comparative negligence. *Harrison,* 295 Md. at 449–53, 456 A.2d at 897–99. Although recognizing the growing trend toward adopting principles of comparative fault, *id.* at 456–58, 456 A.2d at 901–02, we noted, on the other hand, Maryland's long history of applying the doctrine of contributory negligence. *Id.* at 458, 456 A.2d at 902. *See Irwin,* 6 Gill at 205 (adopting the doctrine of contributory negligence); *Pittsburg & Connellsville R.R. Co.,* 39 Md. at 351 (affirming Maryland's adherence to contributory, rather than comparative, negligence).

Although acknowledging further that jurisdictions transitioning from contributory negligence to comparative fault regimes experienced little difficulty in doing so, *Harrison,* 295 Md. at 454, 456 A.2d at 900, we noted that making such a doctrinal change requires consideration of a multitude of options and implications. *Id.* at 462–63, 456 A.2d at 904–05. For example, this Court would have to choose between a pure or modified fault system, and consider "the effect which a comparative fault system would have on other fundamental areas of negligence law," such as the "last clear chance doctrine, assumption of the risk, joint and several liability, contribution, setoffs and counterclaims, and application of the doctrine to other fault systems, such as strict liability in tort. . . ." *Id.* at 455, 456 A.2d at 900. Noting the lack of uniformity among the systems adopted by new comparative fault jurisdictions in their treatment of these areas, we characterized the decision whether to adopt either pure or modified

---

5. At the time of our decision in *Harrison,* thirty-nine states had adopted some form of comparative fault in favor of contributory negligence. 295 Md. at 453, 456 A.2d at 899. Of these states, eight adopted comparative negligence judicially, while thirty-one did so legislatively. *Id.* As of the date of our decision in the present case, twelve of the forty-six states adopting comparative negligence did so initially by judicial decision.

comparative fault as one "plainly involv[ing] major policy considerations." *Id.* at 462, 456 A.2d at 904.

Perhaps overawed by the difficult choices inherent in adopting comparative negligence, however, the *Harrison* court declined to ride atop the tsunami of states abandoning contributory negligence. Instead, the *Harrison* majority observed that "scant attention" had been paid by the Maryland Bench and Bar to the relative merits of contributory and comparative negligence, *id.* at 458, 456 A.2d at 902, and that, although the Legislature had considered numerous bills proposing to adopt comparative fault, none were enacted ultimately. *Id.* at 461–62, 456 A.2d at 904. Thus, ignoring the great societal change nationally demonstrating the unsuitability of contributory negligence principles to modern life, but finding no evidence of that groundswell in Maryland, we deferred instead to the Legislature, inferring from its inaction an "intention to retain the contributory negligence doctrine" as the public policy of the State of Maryland. *Id.* at 462, 456 A.2d at 904. We concluded:

> All things considered, we are unable to say that the circumstances of modern life have so changed as to render contributory negligence a vestige of the past, no longer suitable to the needs of the people of Maryland. In the final analysis, whether to abandon the doctrine of contributory negligence in favor of comparative negligence involves fundamental and basic public policy considerations properly to be addressed by the legislature. We therefore conclude ... that while we recognize the force of the plaintiff's argument, in the present state of the law, we leave any change in the established doctrine to the Legislature.

*Id.* at 463, 456 A.2d at 905 (internal quotation marks and citations omitted). We are given straightforwardly in the present case another opportunity to replace the doctrine of contributory negligence with a system of comparative fault.

## II. The Maryland Court of Appeals Has the Power to Abrogate Contributory Negligence

Unquestionably (as the Majority opinion agrees—see Maj. op. at 691–93, 69 A.3d at 1156–57), this Court has the power to

change the doctrine of contributory negligence. Although the common law may be changed also by legislative act, Md. Const. Decl. of Rts. art. 5, we have stated frequently that it is "our duty to determine the common law as it exists in this State." *Pope v. State,* 284 Md. 309, 341–42, 396 A.2d 1054, 1073 (1979) (quoting *Ass'n of Taxi Oprs. v. Yellow Cab Co.,* 198 Md. 181, 204, 82 A.2d 106, 117 (1951)). *See also Tracey v. Solesky,* 427 Md. 627, 639–40, 50 A.3d 1075, 1081–82 (2012) (quoting *Ireland v. State,* 310 Md. 328, 331–32, 529 A.2d 365, 366 (1987)); *McGarvey v. McGarvey,* 286 Md. 19, 27, 405 A.2d 250, 254 (1979). Contributory negligence is, and has always been, a common law doctrine of judicial origin in this State. *See Irwin,* 6 Gill 200. In the absence of codification by the Legislature, the defense of contributory negligence remains a dependent of the common law, and as such, is within the province of its parent, this Court, to abrogate or modify that to which it gave birth and nurtured. *See, e.g., Price v. State,* 405 Md. 10, 23, 949 A.2d 619, 627 (2008) (noting that because "the Maryland principles governing inconsistent verdicts are neither reflected in statutes nor in the Rules promulgated by this Court[,] . . . those principles . . . [are] part of Maryland common law" and subject to judicial modification); *Jones v. State,* 303 Md. 323, 337 n. 10, 493 A.2d 1062, 1069 n. 10 (1985) ("The common law rule may, within constitutional constraints, be changed or modified by . . . judicial decision. . . ."); *Ireland,* 310 Md. at 331, 529 A.2d at 366 ("[T]he determination of what part of th[e] common law is consistent with the spirit of Maryland's Constitution and her political institutions[ ] are to be made by this Court.").

In accordance with our authority to alter the common law, Petitioner James Coleman ("Coleman") urges this Court to abolish the doctrine of contributory negligence, arguing that it is a vestige of the past. In response, Respondent Soccer Association of Columbia ("SAC") and its Amici[6] claim princi-

---

6. Respondent's Amici include the Local Government Insurance Trust, the Maryland Association of Counties, the Maryland Municipal League, and the Mayor and City Council of Baltimore; the American Tort

pally that this Court is bound by its decision in *Harrison* to retain the doctrine of contributory negligence; but, assuming that we are not bound by *Harrison,* Respondent contends that the abrogation of contributory negligence is more appropriate for legislative, rather than judicial, action, due to the complex policy considerations involved in adopting comparative negligence. I disagree. Principles of *stare decisis* do not require continued adherence to our decision in *Harrison,* nor does this Court owe continued deference to the General Assembly simply because of the difficult choices inherent in formulating a comparative negligence rule. Thus, I would abolish the doctrine of contributory negligence and replace it with comparative fault—"not because [it is] easy, but because [it is] hard." President John F. Kennedy, Address at Rice University on the Nation's Space Effort (12 Sept. 1962).[7]

### A. *Stare Decisis* Does Not Require Retention of the Doctrine of Contributory Negligence

Under the doctrine of *stare decisis,* changes in long-standing "decisional doctrine are left to the Legislature" for purposes of "certainty and stability." *Harrison,* 295 Md. at 458–59, 456 A.2d at 902 (quoting *Deems v. Western Md. Ry. Co.,* 247 Md. 95, 102, 231 A.2d 514, 518 (1967)). *Stare decisis,* meaning to stand by the thing decided, "promotes the even-handed, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process."

---

Reform Association, the Chamber of Commerce for the United States of America, the Coalition for Litigation Justice, Inc., the American Insurance Association, the Property Casualty Insurers Association of America, the National Association of Mutual Insurance Companies, the Physician Insurers Association of America, the American Medical Association, and the NFIB Small Business Legal Center; the Law Offices of Peter G. Angelos, P.C.; Maryland Defense Counsel, Inc.; and the Maryland Chamber of Commerce and the Maryland Tort Reform Coalition.

**7.** Striking a similar theme, Judge Eldridge expressed in his dissent in *Legislative Redistricting Cases,* "[t]he perceived difficulty of the task should not excuse its performance." 331 Md. 574, 635, 629 A.2d 646, 677 (1993) (Eldridge, J., dissenting).

*Livesay v. Baltimore Cnty.,* 384 Md. 1, 14, 862 A.2d 33, 40–41 (2004) (quoting *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991)). Notwithstanding the doctrine of *stare decisis,* the common law remains "subject to judicial modification in the light of modern circumstances or increased knowledge." *Ireland,* 310 Md. at 331, 529 A.2d at 366. As we stated in *Harrison,* we have never construed the doctrine of *stare decisis* "to inhibit us from changing or modifying a common law rule by judicial decision where we find, in light of changed conditions or increased knowledge, that the rule has become unsound in the circumstances of modern life, a vestige of the past, no longer suitable to our people." 295 Md. at 459, 456 A.2d at 903.

Although this Court has declined frequently to alter long-standing common law rules, *see, e.g., Fennell v. Southern Md. Hosp. Ctr.,* 320 Md. 776, 786–87, 580 A.2d 206, 211 (1990) (refusing to revise the common law to permit damages for "lost chance of survival" claims in medical malpractice actions); *Frye v. Frye,* 305 Md. 542, 567, 505 A.2d 826, 839 (1986) (declining to overturn parent-child immunity in motor tort cases); *State v. Minster,* 302 Md. 240, 245, 486 A.2d 1197, 1199 (1985) (refusing to abrogate the common law "year and a day rule"), we may depart from principles of *stare decisis* in two circumstances: (1) when a prior decision was "clearly wrong and contrary to established principles," *Tracey,* 427 Md. at 659, 50 A.3d at 1093 (quoting *State v. Adams,* 406 Md. 240, 259, 958 A.2d 295, 307 (2008)), or (2) "when precedent has been superseded by significant changes in the law or facts." *Id.* (citing *Harrison,* 295 Md. at 459, 456 A.2d at 903). For example, in *B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.,* we abandoned the common law rule of res gestae in favor of the version set forth in the Federal Rules of Evidence, after noting our "[i]ncreased knowledge," "the guidance of a significant majority of other states," and the near-universal condemnation of the common law rule by both courts and commentators. 324 Md. 147, 158, 596 A.2d 640, 645 (1991). Similarly, in *Julian v. Christopher,* we departed from our prior interpretation of silent consent clauses allowing

landlords to refuse unreasonably and arbitrarily a lessee's request to sublet or assign a lease in favor of a standard of reasonableness, after noting summarily that the common law interpretation is a "vestige of the past" and contrary to established public policy. 320 Md. 1, 8–9, 575 A.2d 735, 738–39 (1990).

This Court has shown a willingness to depart from its stale decisions even where we expressed previously an intention to defer to legislative action on a longstanding, but widely-disfavored, common law rule. For example, we declined for decades to abrogate the common law interspousal immunity doctrine prohibiting married women from maintaining actions in tort against their husbands, in each instance deferring expressly to the Legislature. *See Stokes v. Ass'n of Indep. Taxi Operators, Inc.*, 248 Md. 690, 692, 237 A.2d 762, 763 (1968) ("[I]f the rule is to be changed, the Legislature will have to do it."); *Ennis v. Donovan*, 222 Md. 536, 543, 161 A.2d 698, 702 (1960) ("We can only repeat that if it be desirable to permit a married woman, under certain circumstances, to sue her husband in tort, this authorization should emanate from the Legislature, not from the courts."); *Fernandez v. Fernandez*, 214 Md. 519, 524, 135 A.2d 886, 889 (1957) ("We think the appellant here must proceed in equity unless the Legislature sees fit to change the law."); *Gregg v. Gregg*, 199 Md. 662, 667, 87 A.2d 581, 583 (1952) ("[T]hese ancient theories which form a part of the common law have to be followed by us unless they have been changed by legislative action. . . .").

Shortly after our decision in *Harrison*, however, we abrogated the common law doctrine of interspousal immunity in negligence actions.[8] *Boblitz v. Boblitz*, 296 Md. 242, 462 A.2d

---

**8.** *Boblitz* was preceded by *Lusby v. Lusby*, which held that the doctrine of interspousal tort immunity was inapplicable in cases of intentional torts. 283 Md. 334, 358, 390 A.2d 77, 89 (1978). The *Lusby* court emphasized, however, that we had not ruled explicitly that the immunity doctrine did apply in fact to intentional tort cases, and thus justified its limitation of the doctrine on the lack of direct precedent. *Id.* at 357–58, 390 A.2d at 88–89. In considering the issue, the Court noted that many states had altered the common law rule, and commentators had

506 (1983). In so doing, we distanced ourselves from our prior cases and characterized the decision as one appropriate for judicial action.[9] We considered persuasive the evolution of society's conceptions regarding women and the trend toward abrogation in other states, concluding that the foundation of the doctrine no longer coincided with modern values. Thus, we determined that we could depart fairly from principles of *stare decisis* and overrule the doctrine's application in negligence actions as a "vestige of the past." *Id.* at 273–75, 462 A.2d at 521–22. We distinguished *Harrison*, however, as both possessing a history of legislative inaction on proposed bills (lacking in the context of interspousal immunity) and involving necessarily more complex issues, stating that *Harrison* represented an attempt to grant judicially that which "the Legislature repeatedly had rejected efforts to achieve legislatively." *Id.* at 274, 462 A.2d at 521. Yet, we emphasized that, despite our decision in *Harrison*, it remains well within the authority of this Court to abrogate an outmoded rule of the common law. *Id.* at 274, 462 A.2d at 522.

We abandoned completely the doctrine of interspousal immunity finally in *Bozman v. Bozman*, 376 Md. 461, 830 A.2d 450 (2003). We noted that, because forty-six states had done so already, in full or in part, "the trend and, indeed, the great weight of authority" was in favor of abrogating the common law doctrine as "outdated and serv[ing] no useful purpose." *Id.* at 487–88, 830 A.2d at 466. Although we acknowledged that certain aspects of the common law concept, upon which the doctrine rested at its conception, would be retained in various provisions of the Maryland Code, we found such remnants insufficient to shield the doctrine from judicial aboli-

---

been nearly unanimous in their critique of that rule. *Id.* at 346, 350, 390 A.2d at 83–84.

**9.** As the dissent noted, we entreated in prior cases the General Assembly to enact legislation to abrogate the doctrine, and kow-towed repeatedly to the Legislature. *Id.* at 283, 462 A.2d at 525 (Couch, J., dissenting).

tion. *Id.* at 489, 830 A.2d at 466–67. Considering the decisions of our sister jurisdictions to be persuasive authority in analyzing the arguments "both in support of, and against, retention of the interspousal immunity rule," *id.* at 490, 830 A.2d at 467, we determined that the doctrine of *stare decisis* did not require strict adherence to the doctrine or continued legislative deference. *Id.* at 494–95, 830 A.2d at 470.

Thus, as our abrogation of the interspousal tort immunity doctrine demonstrates, this Court has not only the power, but also the responsibility (*Harrison* notwithstanding) to abrogate the doctrine of contributory negligence if it concludes that the state of society and law have changed so that contributory negligence is a vestige of the past, unsuitable to the conditions of modern life. To that end, this Court reviews the foundation of the doctrine to determine its continued relevance in modern society, and considers persuasive, although not binding, the actions of other states on this issue. *See id.* at 490, 830 A.2d at 467. Additionally, we may analyze, to some degree (limited by the factual record before us), "the public policy concerns raised by the parties and by the other courts which have grappled with this issue." *State v. Wiegmann,* 350 Md. 585, 607, 714 A.2d 841, 851 (1998) (quoting *Gaver v. Harrant,* 316 Md. 17, 30, 557 A.2d 210, 217 (1989)).

As noted above, the widespread acceptance of contributory negligence as a complete defense is attributed principally to (1) the desire to protect the nations' newly-developing industry from liability and plaintiff-minded juries, E.A. Turk, *Comparative Negligence on the March,* 28 Chi.-Kent L.Rev. 189, 201 (1950); 4 Harper, James & Gray, *supra,* § 22.1 at 328–30; and (2) "the concept prevalent at the time that a plaintiff's irresponsibility in failing to use due care for his own safety erased whatever fault could be laid at defendant's feet for contributing to the injury." *Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234, 1237 (1981) (citing F. Harper and F. James, Law of Torts, § 22.1 at 1198 (1956)). Neither of these justifications, however, carry weight in present-day Maryland. In today's soci-

ety,[10] there has been no need demonstrated to protect any "newly-developing" industry at the expense of injured litigants. Industry generally in this nation is no longer fledgling or so prone to withering at the prospect of liability. *See, e.g., Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886, 893 (1981) ("There is no longer any justification for providing the protective barrier of the contributory negligence rule for industries of the nation at the expense of deserving litigants."); *Frummer v. Hilton Hotels Int'l, Inc.,* 60 Misc.2d

---

**10.** Although twelve states have abrogated contributory negligence by judicial decision, the prospect of judicial abrogation has been considered and rejected in numerous states. These states generally have not based their decisions on the intrinsic value of the rule of contributory negligence, but instead opted to defer to legislative action. *See, e.g., Golden v. McCurry,* 392 So.2d 815 (Ala.1980); *McGraw v. Corrin,* 303 A.2d 641 (Del.1973); *Maki v. Frelk,* 40 Ill.2d 193, 239 N.E.2d 445 (1968); *Epple v. Western Auto Supply Co.,* 557 S.W.2d 253 (Mo.1977); *Codling v. Paglia,* 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973); *Krise v. Gillund,* 184 N.W.2d 405 (N.D.1971); *Peterson v. Culp,* 255 Or. 269, 465 P.2d 876 (1970). Indeed, legislatures in most of these states have since adopted comparative negligence. *See, e.g.,* Del.Code Ann. tit. 10, § 8132 (enacted 1984); N.Y. C.P.L.R. 1411 (enacted 1975); N.D. Cent.Code § 9–10–07 (enacted 1973), *superseded by* N.D. Cent. Code § 32–03.2–02 (enacted 1987); Or.Rev.Stat. § 31.600, *renumbered,* Or.Rev.Stat. § 18.470 (enacted 1971). *See also* Steven Gardner, *Contributory Negligence, Comparative Negligence, and Stare Decisis in North Carolina,* 18 Campbell L.Rev. 1, 66 & n.419 (1996) (stating that, as of 1996, ten of the twelve states that deferred the abrogation of contributory negligence to the legislature later adopted comparative negligence). Two state courts adopted comparative negligence by judicial decision after deciding explicitly to defer to legislative action in an earlier decision. *See Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981); *Gustafson v. Benda,* 661 S.W.2d 11 (Mo.1983). By contrast, the Alabama Supreme Court is the only court to revisit the adoption of comparative fault after deferring explicitly to its legislature (which remained inactive) and reaffirm the continued vitality of contributory negligence. The Supreme Court of Alabama stated summarily:

We have heard hours of oral argument; we have read numerous briefs; we have studied cases from other jurisdictions and law review articles; and in numerous conferences we have discussed in depth this issue and all of the ramifications surrounding such a change. After this exhaustive study and these lengthy deliberations, the majority of this Court, for various reasons, has decided that we should not abandon the doctrine of contributory negligence, which has been the law in Alabama for approximately 162 years.

*Williams v. Delta Int'l Machinery Corp.,* 619 So.2d 1330, 1333 (Ala. 1993).

840, 304 N.Y.S.2d 335, 341–42 (N.Y.Sup.1969) ("Courts now do not feel any need to act as a protector of our nation's infant industries, for their infancy has long since passed. . . . In an age where a defendant may through various means, such as insurance, readily protect himself from a ruinous judgment, the solicitude of nineteenth century courts for defendants is certainly out of place. . . ."). Moreover, tilting the scales to favor industry is inconsistent with modern conceptions of justice, which focus instead on proportional responsibility and fundamental fairness. *See Hilen v. Hays,* 673 S.W.2d 713, 718 (Ky.1984) ("It may well be that the 19th century judicial mind perceived of the need for courts to tilt the scales of justice in favor of defendants to keep the liabilities of growing industry within some bounds. But assuming such a rule was ever viable, certainly it no longer comports to present day morality and concepts of fundamental fairness." (internal citation and quotation marks omitted)); Robert H. Lande & James MacAlister, *Comparative Negligence with Joint & Several Liability: The Best of Both Worlds,* U. Balt. L.Rev. Online 1, 2 (2012) (noting that Maryland's system of contributory negligence "frustrate[s] the interests of justice as to the litigants"). Rather, the array of Amici lined up in support of the continuation of contributory negligence is populated by the entrenched and established business interests who seek to maintain an economic advantage.

The evolution of society's conceptions of justice is exemplified by the move of tort law away from traditional "all-or-nothing" recovery rules and toward allocation of the burden of liability among at-fault parties. Guido Calabresi & Jeffrey O. Cooper, *The Monsanto Lecture: New Directions in Tort Law,* 30 Val. U.L. Rev. 859, 868 (1995). Liability, in negligence actions, "follows tortious conduct." *Austin v. Mayor & City Council of Baltimore,* 286 Md. 51, 83, 405 A.2d 255, 272 (1979) (Cole, J., dissenting); *Scott,* 634 P.2d at 1241 ("Liability based on fault is the cornerstone of tort law. . . ."). Contributory negligence is at odds with this fundamental premise. By barring recovery completely to a contributorily negligent plaintiff, the rule "visits the entire loss caused by the fault of

two parties on one of them alone, and that one the injured plaintiff, least able to bear it, and quite possibly much less at fault than the defendant who goes scot-free." Prosser, *Comparative Negligence, supra,* at 469.

Respondent and its Amici count as a strength of the doctrine of contributory negligence its inflexibility in refusing to compensate any, even marginally, at-fault plaintiff. They argue that, in so doing, contributory negligence encourages personal responsibility by foreclosing the possibility of recovery for potential, negligent plaintiffs, and thus cannot possibly be outmoded.[11] To the contrary, that the doctrine of contributory negligence grants one party a windfall at the expense of the other is, as courts and commentators alike have noted, unfair manifestly as a matter of policy. *See, e.g., Kaatz v. State,* 540 P.2d 1037, 1048 (Alaska 1975) ("The central reason for adopting a comparative negligence system lies in the inherent injustice of the contributory negligence rule."); *Hoffman v. Jones,* 280 So.2d 431, 436 (Fla.1973) ("Whatever may have been the historical justification for [the rule of contributory negligence], today it is almost universally regarded as unjust and inequitable to vest an entire accidental loss on one of the parties whose negligent conduct combined with the negligence of the other party to produce the loss."); Lande & MacAlister, *supra,* at 4 ("The 'all or nothing' system [of contributory negligence], disconnected from a party's degree of fault, is unfair and counterintuitive."); Prosser, *Comparative Negligence, supra,* at 469 (characterizing contributory negligence as "outrageous" and an "obvious injustice" that

---

11. As some scholars note, the deterrence rationale of contributory negligence (or comparative fault, for that matter) is dubious at best. "If the prospect of losing life and limb does not make a plaintiff careful, little further inducement to care will be added by speculations as to the outcome of a lawsuit. The same thing is often true of defendants. Yet today those who bear the burden of accident liability are increasingly absentee defendants—corporate and other employers or insurance companies, whose lives and limbs are not at stake in the accident.... Defendants, then, will often lack a powerful incentive to carefulness—self-preservation—that is virtually always present with plaintiffs." 4 Harper, James & Gray, *supra,* § 22.2 at 340–41.

"[n]o one has ever succeeded in justifying . . ., and no one ever will"). Moreover, if contributory negligence encourages would-be plaintiffs to exercise caution with respect to themselves, then so too does the doctrine of comparative fault by reducing the plaintiff's recoverable damages. Unlike contributory negligence, however, comparative fault deters also negligence on the part of the defendant by holding him or her responsible for the damages that he or she inflicted on the plaintiff. *See* Lande & MacAlister, *supra*, at 5–6 (noting that, although contributory negligence systems "burden[ ] only plaintiffs with the obligation to take precautions," comparative negligence provides a "mixture of responsibility" that is "the best way to prevent most accidents"); Prosser, *Comparative Negligence, supra,* at 468 ("[T]he assumption that the speeding motorist is, or should be meditating on the possible failure of a lawsuit for his possible injuries lacks all reality, and it is quite as reasonable to say that the rule promotes accidents by encouraging the negligent defendant."). Thus, Respondent's contention that contributory negligence encourages personal responsibility, and is therefore preferable to comparative negligence, is unpersuasive.

Respondent contends also that the foundation of contributory negligence remains strong because, as we said in *Harrison,* "Maryland cases do not reflect any general dissatisfaction with the contributory negligence doctrine." 295 Md. at 458, 456 A.2d at 898. That the courts of this State have applied uniformly the doctrine, however, does not mean that we did not recognize along the way its flaws.[12] *See Bozman,* 376 Md. at 472, 830 A.2d at 457. For example, as Judge Eldridge

---

12. Further, Respondent and its Amici pointed out in oral argument that this Court reaffirmed the continued vitality of the doctrine recently in post-*Harrison* cases. *See, e.g., Thomas v. Panco Mgmt. of Md., LLC,* 423 Md. 387, 417–20, 31 A.3d 583, 601–03 (2011). Our continued adherence to the doctrine of contributory negligence in the cases cited by Respondent do not constitute an endorsement, however, by this Court as to the doctrine's continued value. We decide usually only the questions presented in successful petitions for *certiorari* or which may (or must) be reached fairly on the record in a given case. *See* Md. Rule 8–131. Before granting *certiorari* in the present case, we have not granted *certiorari* to consider whether to abrogate the doctrine of contributory

noted recently, our retention of contributory negligence garnered extensive criticism—"few if any other legal principles have been criticized as much as this Court's continued adherence in negligence actions to the doctrine of contributory negligence and the Court's refusal to adopt comparative negligence." *State v. Adams*, 406 Md. 240, 332, 958 A.2d 295, 351 (2008) (Eldridge, J., dissenting), *overruled by Unger v. State*, 427 Md. 383, 48 A.3d 242 (2012). The Court of Special Appeals also noted similar criticism, calling the doctrine "harsh and pitiless," and noted that we are among the severe minority of states adhering still to it. *See Preston Carter v. Senate Masonry, Inc.*, 156 Md.App. 162, 175, 846 A.2d 50, 58 (2004); *see also Stewart v. Hechinger Stores Co.*, 118 Md.App. 354, 359, 702 A.2d 946, 949 (1997) ("Although we are aware of the often harsh consequences of Maryland's common law doctrine of contributory negligence, and that it has been abandoned by a vast majority of states in favor of some form of comparative negligence, we are in no position summarily to do so.").

Moreover, since our decision in *Harrison*, the doctrine of comparative negligence has continued to be accepted elsewhere as the superior legal principle. At the time *Harrison* was decided, thirty-nine states had replaced the doctrine of contributory negligence with some form of comparative negligence. *See* 295 Md. at 453, 456 A.2d at 899. This trend has continued unabated. Today, the number of states applying comparative negligence is forty-six, and not one jurisdiction adopting it has since retreated and re-adopted contributory negligence. Rather, seven additional states have enacted comparative negligence systems since *Harrison*. What was at the time of *Harrison* a quickening trend within the United States is today an established principle of law in nearly every right-thinking common law jurisdiction in the world, *see Pla-*

negligence since our decision in *Harrison*. Thus, the recent decisions cited by Respondent applying the defense of contributory negligence to bar recovery cannot be construed as a reaffirmation by this Court, as recently as 2011, of the vitality and relevancy of the doctrine of contributory negligence in a modern context.

*cek v. City of Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511, 515 (1979) ("[A]lmost every common-law jurisdiction outside the United States has discarded contributory negligence and has adopted in its place a more equitable system of comparative negligence."); John W. Wade, *A Uniform Comparative Fault Act—What Should it Provide?,* 10 U. Mich. J.L. Reform 220, 221 (1977) (noting that after England, Canada, and Australia abrogated contributory negligence, the United States became the "primary location of the contributory negligence rule"), with the exception of Maryland, Alabama, the District of Columbia, North Carolina, and Virginia. *See* 2 Dobbs, *supra,* § 220 at 772.

Respondent argues, in effect, that there has not been a significant change in the state of law or society since *Harrison,* and therefore there is no reason to depart from *stare decisis* and reconsider whether the doctrine of contributory negligence should be retained in the State of Maryland. I could not disagree more. At the time *Harrison* was decided, the country was in the midst of a broad reform effort sweeping the nation. The doctrine of comparative fault was of fairly recent vintage at the time *Harrison* was filed, adopted in most states in the ten years prior to our decision. *See* Robert D. Cooter & Thomas S. Ulen, *An Economic Case for Comparative Negligence,* 61 N.Y.U. L.Rev. 1067, 1075 (1986) (noting that most states adopted comparative negligence in the 1970s and early 1980s). Essentially, Respondent contends that, because our decision in *Harrison* was made when the movement toward reform of negligence principles was well underway, this Court is constrained to retain the doctrine forever, having missed the single opportunity to get on board the train. Respondent's argument seems to suggest that, so long as there is some delay in abandoning an unjust law, the unjust law remains irretrievably an albatross tied around the neck of our common law, unless and until the Legislature decides to save us.[13] As our decision in *Bozman* demonstrates, however,

---

13. This would be like urging Dr. Wolf Frankenstein (portrayed by Basil Rathbone) to wait to see if the village's elected officials will kill his

our authority to modify the common law and overrule prior decisions is not so limited.

Although only seven additional states have implemented comparative fault since *Harrison,* forty-six states now employ comparative fault.[14] Comparative fault is no longer a trend or a doctrine of recent vintage, but rather is an established and integral doctrine to the negligence systems of nearly every state in the country. Other jurisdictions, most notably those that abrogated contributory negligence judicially, have decades of experience applying comparative fault—experience that, in large part, was lacking at the time we decided *Harrison.* The twelve states to abrogate contributory negligence by judicial decision provide examples of how comparative negligence is applied, how it impacts collateral doctrines and fault systems, and how it is applied in reality.[15] In essence, this Court may foresee more clearly today potential impacts and complications, as well as the value of a comparative fault system, than was possible in 1983. Maryland is no longer at the crest of a wave of reform—instead, it has been left behind, one of the last bastions of contributory negligence in a world which has discarded it as unjust and outmoded. In my estimation, this qualifies certainly as a significant change warranting reconsideration of *Harrison.*

Although I recognize certainly the value of the doctrine of *stare decisis, see, e.g., Unger v. State,* 427 Md. 383, 418, 48

---

monster, before taking matters into his own hands. In the meantime, many villagers will be lost. *See* Son of Frankenstein (Universal Pictures 1939).

**14.** Coincidentally, this is the precise number of jurisdictions that preceded Maryland in abrogating in full the doctrine of interspousal tort immunity. *See Bozman,* 376 Md. at 487, 830 A.2d at 466. A critical mass has been reached for the adoption of comparative negligence, I submit.

**15.** There may be much to learn as well from the evolution of comparative negligence in those states that adopted it initially by legislative act. The subsequent actions by the legislatures (and the courts) in those states will supply insights for how Maryland may address follow-on, collateral issues that are not appropriate to address here because of the limitations of the facts.

A.3d 242, 262 (2012) (Harrell, J., dissenting), I do not believe that in this instance, strict adherence is appropriate or warranted. *See, e.g., Alvis,* 52 Ill.Dec. 23, 421 N.E.2d at 896 ("Clearly, the need for stability in law must not be allowed to obscure the changing needs of society or to veil the injustice resulting from a doctrine in need of reevaluation."); *McIntyre v. Balentine,* 833 S.W.2d 52, 56 (Tenn.1992)(declining to "mindless[ly]" follow *stare decisis* ). I do not believe that because *Harrison* reaffirmed the vitality of contributory negligence in this State, absent legislative action, this Court is muted forever on the topic. The bounds of *stare decisis* are not so strict. Continued adherence to the doctrine of contributory negligence as rote obeisance to the principles of *stare decisis* and legislative deference "represents judicial inertia rather than a reasoned consideration of the intrinsic value of the rule." *Kaatz,* 540 P.2d at 1049. Contributory negligence is no longer justified, has been discarded by nearly every other jurisdiction, and is manifestly unjust. Thus, I conclude that contributory negligence is a vestige of the past, and that in considering whether to abrogate the doctrine of contributory negligence, we are not bound by our decision in *Harrison.*

### B. This Court Need Not Defer to Continued Legislative Inaction

Respondent argues that, notwithstanding our decision in *Harrison,* whether to abrogate contributory negligence in favor of comparative fault is a matter more properly suited to the legislative, rather than judicial, process. In *Harrison,* we noted that "in considering whether a long-established common law rule—unchanged by the legislature and thus reflective of this State's public policy—is unsound in the circumstances of modern life, we have always recognized that declaration of the public policy of Maryland is normally the function of the General Assembly." 295 Md. at 460, 456 A.2d at 903. Because declaration of public policy is generally a matter for the Legislature, we declared our "particular[ ] reluctan[ce] to alter a common law rule in the face of indications that to do so would be contrary to the public policy of the State[,]" *id.,* and

noted that we owe "initial deference to the legislature where change is sought in a long-established and well-settled common law principle." *Id.* at 461, 456 A.2d at 904.

In considering whether the doctrine of contributory negligence was declared the public policy of the State of Maryland, we placed particular emphasis on the Legislature's consideration of numerous bills proposing to adopt the doctrine of comparative negligence. Specifically, we noted that between 1966 and 1982, the General Assembly considered twenty-one bills proposing the adoption of comparative negligence, yet none passed. *Id.* "Although not conclusive," we stated, "the legislature's action in rejecting the proposed change is indicative of an intention [on the part of the Legislature] to retain the contributory negligence doctrine." *Id.*

Our statements in *Harrison* did not circumscribe, however, our authority to alter judicially-created common law rules in the face of repeated legislative inaction on the subject. Although we have declined frequently to effect changes in decisional doctrine upon observing repeated legislative inaction, *see, e.g., Potomac Valley Orthopaedic Assocs. v. Md. State Bd. of Physicians,* 417 Md. 622, 639–40, 12 A.3d 84, 94 (2011) ("Our conclusion is confirmed by the fact that, in 2007, 2008, 2009, and 2010, the General Assembly 'rejected efforts to achieve legislatively that which we [are being] asked to grant judicially.' " (alterations in original) (citation omitted)); *Moore v. State,* 388 Md. 623, 641, 882 A.2d 256, 257 (2005) ("Legislative inaction is very significant where bills have repeatedly been introduced in the General Assembly to accomplish a particular result, and where the General Assembly has persistently refused to enact such bills."), we determined, on multiple occasions, that legislative inaction may not be a sufficient premise from which to draw a positive legislative intent in certain situations. *See, e.g., City of Balt. Dev. Corp. v. Carmel Realty Assocs.,* 395 Md. 299, 329, 910 A.2d 406, 424 (2006) (cautioning against drawing a positive inference from legislative inaction because "the General Assembly may well have ... decided not to enact the amendment for a myriad of other reasons"); *Goldstein v. State,* 339 Md. 563, 570, 664 A.2d 375,

378 (1995) ("[T]he mere fact that the General Assembly has declined to adopt a particular proposal does not preclude this Court from incorporating the substance of that proposal into the common law. . . ."); *Automobile Trade Assoc. of Md., Inc. v. Ins. Comm'r*, 292 Md. 15, 24, 437 A.2d 199, 203 (1981) ("[T]he fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent."); *Cicoria v. State*, 89 Md.App. 403, 428 n. 9, 598 A.2d 771, 775 n. 9 (1991) (noting that "[t]rying to determine what the legislature intended (or did not intend) by rejecting those bills is no easy assignment" and declining to draw either a positive or negative inference from the rejected bills).

Although the *Harrison* court opted to defer to the Legislature, the opinion in that case gives no indication that such deference was unlimited. No acknowledgment was advanced that we lack the authority to alter a long-standing common law rule where the Legislature declines to enact proposed legislation. Rather, we expressed that we are "particularly reluctant" to do so, and that we give *"initial* deference" to the Legislature when considering a change to long-standing common law principles. *Harrison*, 295 Md. at 460–61, 456 A.2d at 903–04 (emphasis added). Further, we did not characterize the inaction of the General Assembly as a conclusive, definitive declaration of public policy—to the contrary, we specifically stated that legislative inaction is "not conclusive" and merely "indicative of an intention to retain the doctrine of contributory negligence." *Id.* at 461, 456 A.2d at 904.

I acknowledge, of course, that legislative consideration of comparative negligence did not cease with our decision in *Harrison.* The General Assembly considered numerous comparative negligence bills since *Harrison,* but has not to this date reached an agreement that comparative negligence should become the law of this State by legislative act.[16] The

---

**16.** As the author of one tort law treatise noted in response to *Harrison,* "The history [of legislative attempts to abrogate contributory negligence] appears more nearly indicative, it is suggested with respect, of

pace of consideration of comparative negligence bills slowed dramatically in recent years, however. Since 2003, the General Assembly considered the adoption of comparative negligence only once, *see* H.B. 110, 2007 Leg., 423d Sess. (Md. 2007), *crossfiled with* S.B. 267, 2007 Leg., 423d Sess. (Md. 2007), whereas in the ten years preceding *Harrison* (1974–83), the Legislature considered ten independent bills. *See* H.B. 1007, 1982 Leg., 388th Sess. (Md. 1982); H.B. 633, 1981 Leg., 387th Sess. (Md. 1981); H.B. 98, 1980 Leg., 386th Sess. (Md. 1980); H.B. 1484, 1980 Leg., 386th Sess. (Md. 1980); H.B. 1381, 1979 Leg., 385th Sess. (Md. 1979); H.B. 1386, 1979 Leg., 385th Sess. (Md. 1979); H.B. 2004, 1977 Leg., 383d Sess. (Md. 1977); H.B. 377, 1976 Leg., 382d Sess. (Md. 1976); S.B. 106, 1976 Leg., 382d Sess. (Md. 1976); H.B. 405, 1975 Leg., 380th Sess. (Md. 1975). No favorable committee action has been taken on a comparative negligence bill since 1988. *See* Department of Legislative Services, *Negligence Systems: Contributory Negligence, Comparative Fault, and Joint and Several Liability* 31 (2004) (hereinafter *"Negligence Systems"*).

Declining to perpetuate unmindful deference to the Legislature on such a topic would not be without precedent. For example, as noted above, this Court stated repeatedly its intention to defer to legislative action on the topic of interspousal immunity before acting. *See Stokes,* 248 Md. at 692, 237 A.2d at 763; *Ennis,* 222 Md. at 543, 161 A.2d at 702; *Fernandez,* 214 Md. at 524, 135 A.2d at 889. Decades later, after noting the Legislature's continued stasis on the subject, we rescinded our deference and modernized an outdated common law rule. *See Bozman,* 376 Md. 461, 830 A.2d 450; *Boblitz,* 296 Md. 242, 462 A.2d 506.

---

the superior ability of insurers' lobbyists to influence a committee or its chairman in a non-public decision-making than an entire legislative body in an open vote." The author goes on to note that, in the Senate's first opportunity to vote on a comparative negligence bill, it passed 45–1 on the floor before being defeated behind closed doors in the House Judiciary Committee. 4 Harper, James & Gray, *supra,* § 22.18 at 495 n.1.

Other states, too, abrogated judicially the doctrine of contributory negligence in spite of legislative inaction on proposed bills of like objective.[17] For example, during the approximate-

---

**17.** States considering the judicial adoption of comparative negligence wrestled generally with the propriety of deferring legislative action versus judicial initiative. Twelve states and the federal government determined that contributory negligence is "a judicially created doctrine which can be altered or totally replaced by the court which created it." *Alvis*, 52 Ill.Dec. 23, 421 N.E.2d at 895. *See United States v. Reliable Transfer Co.*, 421 U.S. 397, 410, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975) (holding that it is appropriate to "adopt the proportional fault doctrine without Congressional action"); *Kaatz*, 540 P.2d 1037, 1049 (Alaska 1975) ("It appears to us that continued adherence to the contributory negligence rule, absent legislative change, represents judicial inertia rather than a reasoned consideration of the intrinsic value of the rule."); *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226, 1233 (1975) (stating that an argument requiring the court to defer to legislative action regarding the abolition of contributory negligence is "fundamentally misguided"); *Hoffman v. Jones*, 280 So.2d 431, 436 (Fla.1973) (stating that the court has the "power and authority to reexamine the position [it] has taken in regard to contributory negligence and to alter the rule [it] ha[s] adopted previously"); *Alvis v. Ribar*, 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886, 896 (1981) (noting that where a "stalemate" exists between the legislature and the court and "the legislature has, for whatever reason, failed to act to remedy a gap in the common law that results in injustice, it is the imperative duty of the court to repair that injustice and reform the law to be responsive to the demands of society"); *Goetzman v. Wichern*, 327 N.W.2d 742, 752 (Iowa 1982) ("We believe the arguments for deference to the legislature in the present case are substantially outweighed by the considerations reflected in the decisions of other courts that have addressed the issue, the analyses of the commentators, and the concept of the judicial role exemplified in past decisions of this court."); *Hilen v. Hays*, 673 S.W.2d 713, 716–17 (Ky.1984) (declining to continue deference to the legislature despite recent legislative consideration of comparative negligence bills); *Placek v. City of Sterling Heights*, 405 Mich. 638, 275 N.W.2d 511, 518 (1979) ("[W]e find adoption of comparative negligence is consistent with this Court's responsibility to the jurisprudence of this state."); *Gustafson v. Benda*, 661 S.W.2d 11, 14–15 (Mo.1983) ("We have remained quiescent more than five years while waiting for the legislature to act. . . . We now are past the time when we should have resolved the uncertainty surrounding comparative fault . . ."); *Scott v. Rizzo*, 96 N.M. 682, 634 P.2d 1234, 1239 (1981) (stating that, "since the rule [of contributory negligence] is not one made or sanctioned by the legislature, but . . . depends for its origins and continued viability upon the common law, it is a rule peculiarly for the courts to change if it is no longer justified" (internal quotation marks and citation omitted)); *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 399 S.E.2d 783, 784 (1991) (determining that comparative negligence is the

ly fifteen years prior to the Kentucky Supreme Court's abrogation of contributory negligence in 1984, the Kentucky Legislature considered a comparative negligence bill "in most, if not all" legislative sessions. *Hilen,* 673 S.W.2d at 717. Yet, despite legislative consideration of (and inaction on) the issue, the Kentucky Supreme Court abrogated the doctrine, noting its systematic rejection, "first legislatively, and then judicially where the legislature has refused to act." *Id.* at 716–17. Similarly, the Missouri Supreme Court deferred repeatedly to legislative consideration and an opportunity to act for over five years, noting that ordinarily the policy considerations implicit in making such a doctrinal change were more appropriate for the legislature, particularly in light of increased legislative interest in the topic. *See Steinman v. Strobel,* 589 S.W.2d 293, 294 (Mo.1979); *Epple v. Western Auto Supply Co.,* 557 S.W.2d 253, 254 (Mo.1977). Indeed, even after applying a nudge to the legislature by abandoning "active-passive negli-

---

"more equitable doctrine" and abolishing the "long-standing rule of contributory negligence" with reference to the lengthy discussion in *Langley v. Boyter,* 284 S.C. 162, 325 S.E.2d 550 (S.C.Ct.App.1984)); *McIntyre v. Balentine,* 833 S.W.2d 52, 56 (Tenn.1992) ("We recognize that this action could be taken by our General Assembly. However, legislative inaction has never prevented judicial abolition of obsolete common law doctrines, especially those, such as contributory negligence, conceived in the judicial womb."); *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879, 884 & n. 14 (1979) (noting that the judiciary is capable of developing and adjusting the common law to grow with and adapt to changes in society). *But see, e.g., Golden v. McCurry,* 392 So.2d 815, 817 (Ala.1981) (stating that, "even though this Court has the inherent power to change the common law rule of contributory negligence, it should, as a matter of policy, leave any change of the doctrine of contributory negligence to the legislature"); *Codling v. Paglia,* 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622, 630 (1973) ("With full awareness that the doctrine was of judicial rather than legislative origin, we are nonetheless not prepared at this time to substitute some formula of comparative negligence. In our opinion this is a topic now more appropriate for legislative address.") (comparative negligence enacted legislatively in 1975); *Krise v. Gillund,* 184 N.W.2d 405, 409 (N.D.1971) ("We believe that the abandonment by the courts of a long-standing rule, which would result in the adoption of any one of a number of interpretations of the comparative-negligence rule, is a change of such magnitude that it should be made by legislative, rather than by judicial, action.") (comparative negligence enacted legislatively in 1973).

gence" in favor of comparative fault principles in cases involving multiple defendants, *see Missouri Pac. R.R. Co. v. Whitehead & Kales Co.*, 566 S.W.2d 466 (Mo.1978), the Missouri Supreme Court continued to express its preference for legislative action. *Steinman*, 589 S.W.2d at 294. By 1983, however, shortly after our decision in *Harrison*, the Missouri Supreme Court decided it had waited long enough and abrogated contributory negligence generally by judicial decision, stating, "We have remained quiescent more than five years while waiting for the legislature to act." *Gustafson v. Benda*, 661 S.W.2d 11, 15 (Mo.1983).

The New Mexico Supreme Court asserted that its legislature's inaction on proposed bills could be "indicative of its belief that it is more appropriate for the judiciary than the legislature to open the door which the judiciary initially closed." *Scott*, 634 P.2d at 1238–39. It characterized further legislative inaction as resulting from "legislative inertia," rather than from a principled policy decision. *Id.* The Illinois Supreme Court also noted that a stalemate caused by a "mutual state of inaction in which the court awaits action from the legislature and the legislature awaits guidance from the court" constitutes a "manifest injustice to the public." *Alvis*, 421 N.E.2d at 896. In such a situation, the court said, "it is the imperative duty of the court to repair that injustice and reform the law to be responsive to the demands of society." *Id.* Consequently, we should put an end to the staring contest in Maryland and act to conclude the Alphonse & Gaston routine that has settled in between our two branches of government.

Respondent also contends that, the abstract principle of deference to legislative inaction notwithstanding, replacing the doctrine of contributory negligence is a task more appropriate for legislative action because that potential deliberative and comprehensive decision-making process is suited better to resolution of the complex policy considerations involved in adopting comparative fault and its collateral impacts. The *Harrison* court expressed a particular reluctance to abrogate contributory negligence due to the nature of comparative

negligence as not being "a unitary doctrine[,] but one which has been adopted by other states in either a pure or modified form." 295 Md. at 462, 456 A.2d at 904. Characterizing the choice between pure and modified comparative fault as "a policy issue of major dimension," this Court opted in 1983 to leave the choice to the General Assembly. *Id.* at 463, 456 A.2d at 905. Respondent contends that, because this decision implicates policy considerations and this Court is limited in its consideration of the impact on collateral doctrines and principles by the facts of this case,[18] we should continue to refrain from adopting comparative negligence and disrupting long-settled law to avoid confusion and disarray in our courts. Moreover, Respondent and its Amici argue that abolishing the doctrine of contributory negligence is bad public policy. They contend that in so doing, we would inject chaos and uncertainty into an area of settled law, and increase litigation, insurance rates, and taxes.[19]

Although the transition from contributory to comparative negligence systems is plainly "a policy issue of major dimen-

---

18. The present case does not involve multiple defendants. Thus, there are no joint tortfeasors. There is no governmental defendant here to tee-up questions under governmental tort claims statutes.

19. Respondent and its Amici cite to numerous studies bemoaning the potential for increased litigation, taxes, and insurance rates if Maryland were to adopt comparative negligence. The research on such topics, however, is highly conflicted, and studies concluding that insurance rates will increase are criticized roundly for "lack of academic rigor" and failing to consider and control for additional variables. *See Negligence Systems, supra,* at 21, 55–63.

It is recognized generally that no "good data" exists on whether comparative negligence increases insurance rates, due to the difficulty of controlling for all of the variables existing in state automobile insurance markets. As acknowledged in the 2004 Maryland Department of Legislative Services Report, "[i]n the absence of any comprehensive study, it is impossible to state with any certainty the direct and indirect consequences of changing to a comparative negligence system." *Id.* at 21. The possibility that comparative fault may increase insurance rates is insufficient to justify retention of what is certainly an unjust system. As the Supreme Court of Kentucky stated in response to this very argument, "there are no *good* economies in an *unjust* law." *Hilen,* 673 S.W.2d at 718 (emphasis in original).

sion," I do not think that it is an issue on which awaiting legislative catharsis is appropriate any longer. Contributory negligence is a spawn of the court system—and as such, this Court is eminently able and uniquely situated to stay the course. Moreover, as the South Carolina Court of Appeals noted, the potential for a legislative body to affect comprehensively a doctrinal substitution has not proven out uniformly in execution. *Langley v. Boyter*, 284 S.C. 162, 325 S.E.2d 550, 560 (App.1984), *quashed*, 286 S.C. 85, 332 S.E.2d 100 (1984), *cited with approval*, *Nelson v. Concrete Supply Co.*, 303 S.C. 243, 399 S.E.2d 783, 784 (1991) ("[T]he history of legislative action in the various states which have adopted the doctrine [of comparative negligence] by statute reveals that comprehensive statutes are not usually adopted."). Rather, most states adopting comparative negligence via legislative act have enacted short-form statutes that leave most doctrinal issues to be shaped and developed by the courts. *Id.*

Additionally, deferring this issue to a future court or legislative session on grounds that the present case offers insufficient facts to reach binding declarations regarding all collateral doctrines and principles does not weigh so heavily as this Court's responsibility to administer justice. As this argument goes, "in essence, . . . where a court cannot correct all injustice, it should correct none." *Id.* I am not persuaded that making the change by judicial decision, necessarily leaving some further development of the doctrine of comparative negligence to another day, will wreak havoc on our system of justice or the State's economy. To the contrary, the experiences of other states, having made an analogous change, "provide an accurate barometer of what can be expected after abrogation." *Bozman*, 376 Md. at 496, 830 A.2d at 471. In the twelve other states to abrogate by judicial decision the doctrine of contributory negligence, there is scant evidence that the judicial system was thrown into unmanageable disarray. In fact, other courts noted that "the fears of administering the doctrine are greater than the reality," and that the difficulties presumed inherent in the adoption of comparative negligence "are outweighed by the injustices attendant upon

any delay in adopting the comparative negligence (fault) rule." *Scott,* 634 P.2d at 1239, 1241.

I recognize that a shift to comparative fault implicates numerous collateral doctrines. I expect fully that questions will arise about the application of comparative fault in practice in the State of Maryland that cannot be answered conclusively in the present case. This Court would be well-served, however, to place trust in the full array of the Judiciary of this State to administer faithfully the principles of comparative negligence in accordance with this Court's direction. Thus, I reject Respondent's contention that this matter is best left to a legislative enactment that *might* address all potential applications of the doctrine of comparative negligence in a single coup, rather than trusting to the incremental decisions that follow in the common law tradition, beginning with a seminal action by this Court.

### III. This Court Should Adopt Pure Comparative Fault

Having concluded, as I have, that the doctrine of contributory negligence must fall, the question becomes: what form of comparative negligence should be adopted? Although the precise formulations of comparative fault systems may vary, there are essentially two basic forms: pure and modified.

Under a system of pure comparative fault, damages are apportioned among the parties according to the fact finder's determination of the percentage that each party's negligence contributed to the injury. Cooter & Ulen, *supra,* at 1076. A plaintiff is permitted to recover from the defendant (or defendants) the portion of his or her damages which the defendant (or defendants) caused—regardless of the quantum of the plaintiff's contributory negligence. 4 Harper, James & Gray, *supra,* § 22.15 at 458. Thus, even if the plaintiff's degree of fault exceeds that of the defendant (or defendants), the plaintiff may recover damages reduced by the proportion that the plaintiff is at fault. *See id.;* Digges & Klein, *supra,* at 280.

Modified comparative fault, by contrast, considers relevant the proportion of the plaintiff's relative fault in varying de-

grees, depending on the standard adopted. Under such systems, a plaintiff "escapes the contributory negligence bar only if his share of the responsibility falls within a specified limitation." 4 Harper, James & Gray, *supra*, § 22.15 at 458. States that adopt a modified system generally choose one of two forms, allowing recovery of damages by a plaintiff reduced by the percentage of his or her own fault if either (1) the plaintiff's relative fault is less than the combined fault of all of the defendants;[20] or (2) the plaintiff's relative fault is not greater than the combined fault of all of the defendants.[21, 22]

This Court should adopt for Maryland pure comparative negligence. Pure comparative negligence is favored almost universally by legal scholars and academics. It is "the fairest, most logical and simplest to administer of all available systems." *Goetzman*, 327 N.W.2d at 754. Because pure comparative negligence emphasizes the relationship of an individual's fault to the ultimate damages, "[n]either party is unjustly enriched[, and] [n]either party escapes liability resulting from his negligent acts or omissions." *Alvis*, 421 N.E.2d at 897. The shades of gray in jury determinations[23] assigning propor-

---

**20.** This is more commonly referred to as the "less than fifty percent," or the "not as great as," approach. Twelve states employ this approach. Standing Committee on Rules of Practice and Procedure, *Special Report to [Maryland] Court of Appeals on Aspects of Contributory Negligence and Comparative Fault* 9 & n.7 (2011)(hereinafter "Rules Committee Report").

**21.** This approach is known generally as the "50%," or the "not greater than," approach. Twenty-one states employ this approach. Rules Committee Report, *supra*, at 9 & n. 8.

**22.** In both types of modified comparative fault, there is some inconsistency regarding whether a plaintiff's proportionate fault is to be judged against each defendant individually, or all defendants collectively. Three states—Idaho (not as great as), Minnesota (not greater than), and Wisconsin (not greater than)—employ the individual approach, requiring the plaintiff's proportion of fault to be judged against each defendant's fault to determine if the plaintiff can recover against that particular defendant. Rules Committee Report, *supra*, at 21–22.

**23.** For those familiar only with the application of contributory negligence, it may be difficult to comprehend specifically how a jury is to reach a determination of relative fault in exact percentages. As the

tions of fault is not, in a pure system, the difference between substantial recovery and no recovery at all. *See* Prosser, *Comparative Negligence, supra,* at 493–94 ("It is obvious that a slight difference in the proportionate fault [under a modified system] may permit a recovery; and there has been much quite justified criticism of a rule under which a plaintiff who is charged with 49 per cent of the total negligence recovers 51 percent of his damages, while one who is charged with 50 per cent recovers nothing at all."). Critics of pure comparative negligence call it a "radical break" from the principles of contributory negligence, and view a modified version instead as a logical evolution away from contributory negligence. *See Bradley v. Appalachian Power Co.*, 163 W.Va. 332, 256 S.E.2d 879, 885 (1979) (noting an unwillingness "to abandon the concept that where a party substantially contributes to his

---

Supreme Court of Illinois stated, "[t]he simple and obvious answer ... is that in [46] jurisdictions of the United States such apportionment is being accomplished by juries," and is "no more difficult or sophisticated for jury determination than others in a jury's purview, such as compensation for pain and suffering." *Alvis,* 52 Ill.Dec. 23, 421 N.E.2d at 893. Or, as Petitioner asserted in oral argument, this is, quite simply, what juries do. *See, e.g.,* Lande & MacAlister, *supra,* at 7 (noting that juries decide complex questions routinely).

I agree with the Supreme Court of Tennessee that, while "it is impossible to formulate an exhaustive set of guidelines for apportioning fault that will adequately cover the manifold circumstances in which negligence actions may arise, ... trial courts and juries must have some guidance, however imprecise and imperfect, in discharging their respective duties in apportioning fault." *Eaton v. McLain,* 891 S.W.2d 587, 591 (Tenn.1994). Juries should continue to be guided by the tenets of our traditional negligence law—for example, the relevant standard of care owed by the parties and the causal relationship between the parties' actions and the harm caused—as well as other tort doctrines that may, or may not, be subsumed by a shift to comparative fault, such as assumption of the risk and the doctrine of last clear chance. *See Eaton,* 891 S.W.2d at 592 (directing consideration of traditional common law negligence principles such as implied assumption of the risk, remote contributory negligence, last clear chance, the sudden emergency doctrine, and the rescue doctrine); National Conference of Commissioners on Uniform State Laws, Uniform Comparative Fault Act § 2 Comment (1977) (hereinafter "UCFA"). Relative degrees of fault are dependent upon the circumstances and facts of each case, and juries should "rely upon their common sense and ordinary experience in apportioning fault." *Eaton,* 891 S.W.2d at 593.

own damages, he should not be permitted to recover for any part of them"). Pure comparative negligence, however, more closely hews to the principle on which comparative fault systems are based—that liability should be commensurate with fault, and that individuals are responsible to the extent that their fault results in injury. *See Goetzman,* 327 N.W.2d at 753–54; Lande & MacAlister, *supra,* at 9 ("[O]nly a 'pure' system protects all the deserving injured, is fair to defendants, optimally deters negligent behavior, and fosters the greatest sense of justice, fairness, and respect for the law on the part of juries.").

Moreover, although pure comparative negligence is the numerically minority choice nationally,[24] it is the preferred version among states adopting comparative negligence by judicial decision. Nine of the twelve states adopting comparative negligence judicially have chosen a pure system,[25] while three chose a modified version.[26] Modified systems "reintroduce in

---

**24.** Twelve of the forty-six comparative fault states employ pure comparative fault, while thirty-three apply a form of modified fault. Rules Committee Report at 9–10. South Dakota, although considered to be a comparative fault jurisdiction, applies neither a pure nor modified system. Instead, it applies a slight negligence standard. Christopher J. Robinette & Paul G. Cherland, *Contributory or Comparative: Which is the Optimal Negligence Rule?,* 24 N. Ill. U.L.Rev. 41, 44 (2003).

**25.** *See Kaatz v. State,* 540 P.2d 1037, 1049 (Alaska 1975); *Li v. Yellow Cab Co.,* 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226, 1242 (1975); *Hoffman v. Jones,* 280 So.2d 431, 438 (Fla.1973); *Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886, 898 (1981); *Goetzman v. Wichern,* 327 N.W.2d 742, 753 (Iowa 1982); *Hilen v. Hays,* 673 S.W.2d 713, 719 (Ky.1984); *Placek v. City of Sterling Heights,* 405 Mich. 638, 275 N.W.2d 511, 519 (1979); *Gustafson v. Benda,* 661 S.W.2d 11, 15 (Mo.1983); *Scott v. Rizzo,* 96 N.M. 682, 634 P.2d 1234, 1241 (1981). In two of the states that adopted judicially pure comparative fault, the legislature codified later a form of modified comparative fault. *See* 735 Ill. Comp. Stat. § 5/2–1116 (2012) (abrogating *Alvis v. Ribar,* 85 Ill.2d 1, 52 Ill.Dec. 23, 421 N.E.2d 886 (1981) in favor of a modified comparative fault system); Iowa Code § 668.3 (2011) (abrogating *Goetzman v. Wichern,* 327 N.W.2d 742 (Iowa 1982) in favor of a modified comparative fault system).

**26.** *See Nelson v. Concrete Supply Co.,* 303 S.C. 243, 399 S.E.2d 783, 784 (1991); *McIntyre v. Balentine,* 833 S.W.2d 52, 57 (Tenn.1992); *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879, 885 (1979).

large measure the very same all-or-nothing feature of contributory negligence that the remedy of comparative negligence is designed to overcome," by establishing a new set point at which recovery for a contributorily negligent plaintiff is barred. 4 Harper, James & Gray, *supra,* § 22.15 at 463; *see also Li,* 119 Cal.Rptr. 858, 532 P.2d at 1242 (criticizing a modified system as simply shifting the "lottery aspect" of contributory negligence to a different set point); *Alvis,* 52 Ill.Dec. 23, 421 N.E.2d at 898 ("There is no better justification for allowing a defendant who is 49% at fault to completely escape liability than there is to allow a defendant who is 99% at fault under the old rule to escape liability."). Maryland courts should apply a system of pure comparative fault in negligence actions.

### IV.  Some Ruminations on the Possible Effect on Collateral Doctrines of the Adoption of Comparative Fault

Adopting a system of comparative fault will impact undoubtedly numerous collateral doctrines in the law of torts, as we recognized in *Harrison.* Indeed, as the Florida Supreme Court acknowledged, "the prospect of a general upheaval in pending tort litigation has always been a deterring influence in considering the adoption of a comparative negligence rule." *Hoffman v. Jones,* 280 So.2d 431, 439 (Fla.1973). Although the facts of the present case and Petitioner's questions for which we issued a writ of *certiorari* do not permit a binding consideration of the possible effects on these collateral doctrines, it is prudent nonetheless to itemize and comment on here a few, but by no means an exhaustive list, of the potential impacts of a decision to adopt comparative negligence.

---

Most states adopting modified comparative fault have done so through legislative action. Scholars and commentators disagree generally with modified comparative fault. *See, e.g.,* 4 Harper, James & Gray, *supra,* § 22.15 at 459–61 ("It is difficult to demonstrate a rational reason [for the adoption by legislatures of modified comparative fault]. A common explanation, in terms of pressures on legislators by lobbyists for defense interests, is not implausible.").

Even after the abrogation of contributory negligence, the spirit of that doctrine will remain in some statutory provisions. For example, as Respondent and its Amici point out, the principles of contributory negligence are codified in various limited contexts in the Maryland Code. That remnants of a discarded common law doctrine may remain after its abolition does not provide, however, a reason to retain it in its entirety for all purposes. *Cf. Bozman,* 376 Md. at 488, 830 A.2d at 466 (acknowledging that despite the Court's abolition of the doctrine of interspousal immunity, remnants of the common law concept upon which the doctrine was based remain in Maryland law). We do not have the authority to overrule any principles of contributory negligence embedded currently in the statutory law of this State. *See* Md. Const. Decl. of Rts. art. 8. Thus, where the Legislature codified these principles as a complete bar to recovery in those limited contexts, it will continue to serve as a defense in those actions governed by the relevant statute, unless and until the General Assembly decides otherwise. *See* Md. Code (1977, 2009 Repl. Vol.), Transportation Article § 19–101(b) ("This State or a political subdivision of this State may use the defense of contributory negligence and assert the doctrine of last clear chance in an action brought or defense raised under this section."); Md. Code (1977, 2009 Repl. Vol.), Transportation Article § 19–102(c) ("This State or a political subdivision of this State may use the defense of contributory negligence and assert the doctrine of last clear chance in an action brought or defense raised under subsection (b) of this section."). Where the principles of contributory negligence have not been codified, however, the doctrine of pure comparative negligence, as the common law of this state, should apply henceforth.[27]

Interestingly, concepts of contributory negligence will continue to be embedded in Maryland common law under a comparative fault system. The adoption of comparative fault abolishes the doctrine of contributory negligence as a complete

---

**27.** What I mean by "henceforth" will be amplified shortly in this opinion.

bar to a plaintiff's recovery, but an individual's "contributory negligence" remains relevant as a consideration in determining his or her degree of fault in contributing to his or her injury. Thus, statutes that disallow presently certain conduct from consideration as evidence of contributory negligence may have continued applicability in a comparative fault system,[28] while others may merit consideration for revision by the General Assembly to make their continued applicability in a comparative fault system, if any, more clear. *See, e.g.,* Md. Code (1973, 2006 Repl. Vol.), Courts & Judicial Proceedings Article, § 3–1607 ("A defendant in an action under this subtitle may not raise a defense of assumption of risk or contributory negligence based on the use of a controlled dangerous substance by the deceased individual."); Md. Code (2007, 2012 Supp.), Human Services Article, § 7–704(b)(2) ("The failure of a blind or visually impaired pedestrian to carry a cane ... does not constitute contributory negligence per se.").

Respondent and its Amici contend further that the adoption of comparative fault will have serious effects on the fiscal

---

**28.** *See, e.g.,* Md. Code (1977, 2009 Reply. Vol.), Transportation Article, § 21–1306(e)(1)(i)–(ii) ("The failure of an individual to wear protective headgear required under subsection (b) of this section may not: (i) Be considered evidence of negligence; (ii) Be considered evidence of contributory negligence"); Md.Code (1977, 2012 Supp.), Transportation Article, § 21–1306.1(e)(1)(i)–(ii) (same); Md.Code (1977, 2009 Repl.Vol.), Transportation Article, § 22–201.2(c)(1)(i)–(ii) ("If a person is convicted under this section, the conviction may not: (i) Be considered evidence of negligence; (ii) Be considered evidence of contributory negligence"); Md.Code (1977, 2009 Repl.Vol.), Transportation Article, § 22–412.2(i) ("A violation of this section is not contributory negligence and may not be admitted as evidence in the trial of any civil action."); Md.Code (1977, 2009 Repl. Vol.), Transportation Article, § 22–412.3(h)(1)(i)–(ii) ("Failure of an individual to use a seat belt in violation of this section may not: (i) Be considered evidence of negligence; (ii) Be considered evidence of contributory negligence"); Md.Code (1977, 2009 Repl.Vol.), Transportation Article, § 22–412.4(c)(1)(i)–(ii) ("The failure of a person to use a seat belt or restraining device required under this section may not: (i) Be considered evidence of negligence; (ii) Be considered evidence of contributory negligence"); Md.Code (2002, 2012 Repl.Vol.), Criminal Law Article, § 4–104(e)(1)(i)–(ii) ("A violation of this section may not: (i) be considered evidence of negligence; (ii) be considered evidence of contributory negligence").

health of our State and local government. Because the unavailability of contributory negligence as an absolute bar to recovery will increase the number of "meritless claims presented," they argue, governments will face increased liability. The possibility that state and local governmental liability may increase following the adoption of comparative fault is by no means certain. There is no evidence, and indeed Amici provide none, that other states have experienced skyrocketing governmental liability and fiscal disaster following the adoption of comparative negligence. Moreover, the adoption of comparative fault by no means limits the reactive power of the General Assembly. To the contrary, the Legislature remains in the position to observe the actual impacts of a comparative fault system in Maryland and adopt or amend statutes accordingly, if it deems change necessary.[29] Moreover, if, as Amici contend, the General Assembly intended the defense of contributory negligence to apply to actions brought under the Local Government Tort Claims Act ("LGTCA"), despite failing to codify expressly that defense, *see* Md. Code (1973, 2006 Repl. Vol.), Courts & Judicial Proceedings Article, § 5–303, the Legislature has the authority to amend explicitly the LGTCA to so provide.

Respondent and its Amici express particular concern over the continued vitality of the principles of joint and several liability, and the attendant issue of contribution among joint tortfeasors, in a comparative fault system. I recognize that, following the adoption of a comparative fault system, the continued vitality and fairness of the doctrine of joint and several liability merits specific attention. Indeed, most states adopting comparative negligence have revisited this issue, *see, e.g., McIntyre*, 833 S.W.2d at 58 ("Having thus adopted a rule more closely linking liability and fault, it would be inconsistent to simultaneously retain a rule, joint and several liability, which may fortuitously impose a degree of liability that is out

---

29. Indiana, for example, does not apply its comparative fault doctrine to suits against governmental entities, applying instead the doctrine of contributory negligence. *See Penn Harris Madison Sch. Corp. v. Howard,* 861 N.E.2d 1190, 1193 (Ind.2007).

of all proportion to fault."), although little consensus among states resulted.[30] Because joint and several liability is not implicated by the facts of the present case, however, we reserve the evaluation and determination of whether a departure from common law joint and several liability is warranted, and, if so, in what circumstances.

We also recognize that, regardless of the impact of a reconsideration of the applicability of joint and several liability, there may exist at least a theoretical inconsistency between the Uniform Contribution Among Tortfeasors Act ("UCATA") as codified at Md. Code (1973, 2012 Supp.), Courts & Judicial

---

**30.** As noted by the 2004 Maryland Department of Legislative Services study, only eight of the states employing comparative fault retain joint and several liability in its entirety, although, conversely, only ten abolished it completely. The remaining twenty-eight states employ joint and several liability in specified instances. *Negligence Systems, supra,* at 17. For example, joint and several liability is retained generally where multiple tortfeasors act in concert; some states apply the doctrine where multiple tortfeasors commit environmental harm; and some apply it where there is no contributory fault on the part of the claimant. Rules Committee Report, *supra,* at 23–24; National Conference of Commissioners on Uniform State Laws, Uniform Apportionment of Tort Responsibility Act at 4–5 (2003) (hereinafter "UATRA").

Although the Uniform Comparative Fault Act retained joint and several liability completely, *see* UCFA § 4, Comment, the more recent relevant uniform act, the Uniform Apportionment of Tort Responsibility Act ("UATRA"), limits the application of the doctrine. The UATRA abolishes joint and severally liability generally, but retains it in four instances: (1) where two or more tortfeasors act in concert with intent to cause personal injury or harm to property; (2) where one party fails to prevent another party from intentionally causing personal injury or harm to property; (3) where the liability of one defendant is based on the act or omission of another party; and (4) where another statute requires the judgment to be entered jointly and severally. UATRA § 6(a). As the Rules Committee noted in considering the potential modification of joint and several liability, "[t]here is a smorgasbord from which to choose." Rules Committee Report, *supra,* at 24. *See also* Lande & MacAlister, *supra,* at 10–13 (arguing that a pure comparative fault system, in conjunction with joint and several liability, "preserves joint and several liability's many virtues while properly deducting from a plaintiff's recovery a percentage commensurate with his or her breach of the duty to look out for his or her own safety.").

Additionally, states abolishing joint and several liability confront the attendant issue of whether, and, if so, how to reallocate among remaining parties an uncollectible share of liability.

Proceedings Article, §§ 3–1401–09, and a system of comparative negligence. While the touchstone of a system of comparative negligence is the imposition of liability in direct proportion to one's fault, the current provisions of the UCATA permit one joint tortfeasor to obtain contribution from another joint tortfeasor if he, she, or it has paid more than his, her, or its "pro rata share." *Id.* at § 3–1402. A pro rata share is understood generally, however, as an equal share of the common liability, rather than a share based on an individual's proportion of fault, and thus may be inconsistent with the foundations of comparative negligence.[31] *See Hashmi v. Bennett,* 416 Md. 707, 719 n. 13, 7 A.3d 1059, 1066 n. 13 (2010) (quoting *Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 579, 616, 398 A.2d 490, 511 (1979), *rev'd on other grounds sub nom, General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980)). Abiding future legislative action and/or appellate opinions, however, contribution among joint tortfeasors should continue to apply in pro rata shares.

Another potential issue for future resolution is the determination of which parties should be included in the pool of fault—specifically, how uncharged parties and released tortfeasors are treated under a comparative fault scheme in apportioning fault. The UATRA, for example, compares fault only among those individuals or entities that are actual parties to the litigation, but does not preclude any defendant from pursuing a nonparty. It contains an exception, however, for released tortfeasors, requiring that the responsibility of released tortfeasors be considered in apportioning fault among non-released parties. States are split on this approach—some follow the UATRA; others that initially adopted the UATRA approach amended their laws later to *require* apportionment of fault to nonparties; and, still others permit, but do not require, the consideration of nonparties in apportioning fault. *See* Rules Committee Report, *supra,* at 19–20.

---

**31.** Massachusetts has long applied a pro rata contribution scheme in conjunction with a system of comparative fault. *See Shantigar Found. v. Bear Mountain Builders,* 441 Mass. 131, 804 N.E.2d 324, 332 (2004).

Although I would decide today to apply a system of pure comparative fault only to negligence actions, other states adopting systems of comparative fault have confronted the breadth with which a system of comparative fault should be applied—in particular, whether to expand the reach of comparative fault to strict liability and intentional torts. The defense of contributory negligence long has been held inapplicable to actions based on strict liability, *see Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 597, 495 A.2d 348, 356 (1985), and intentional torts. *See Tucker v. State, Use of Johnson,* 89 Md. 471, 486, 43 A. 778, 783 (1899); *State Farm v. Hill,* 139 Md.App. 308, 316–18, 775 A.2d 476, 481–82 (2001). Approximately thirty-five states have opted to apply the doctrine of comparative fault to strict liability cases, in additional to negligence actions, although ten do not. *See Negligence Systems, supra,* at Appendix A, 37–41. Although many states do not endorse the application of comparative fault to intentional torts, *see, e.g., Florenzano v. Olson,* 387 N.W.2d 168, 176 n. 7 (Minn.1986) ("We ... consider it bad policy to permit an intentional tortfeasor the defense of comparative negligence merely because he or she chooses a gullible or foolish victim."); *Davies v. Butler,* 95 Nev. 763, 602 P.2d 605, 611 (1979) (declining to apply comparative fault to intentional acts), some do. *See, e.g.,* Alaska Stat. § 09.17.900 (2012) (including intentional conduct in the definition of fault); *Blazovic v. Andrich,* 124 N.J. 90, 590 A.2d 222, 231 (1991) ("We are unpersuaded by the decisions of other jurisdictions that reject apportionment of fault in actions involving intentional tortfeasors."). Consideration of the expansion of comparative fault beyond negligence actions is a bridge too far at this time.

Additionally, this Court should consider eventually (in the proper case) the continued vitality of the ameliorative doctrine of last clear chance. Most states that abrogate contributory negligence by judicial decision abolished contemporaneously the doctrine of last clear chance. *See, e.g., Kaatz,* 540 P.2d at 1050; *Hoffman,* 280 So.2d at 438; *Alvis,* 52 Ill.Dec. 23, 421 N.E.2d at 898. Because the doctrine of last clear chance is designed to mitigate the harsh results of contributory negli-

gence, it seems likely that it may not survive the abrogation of contributory negligence. The facts giving rise to a traditional application of the doctrine may be relevant, however, in apportioning fault.

As we recognized in *Harrison*, the handling of set-offs and counterclaims are implicated by a decision to adopt comparative fault. Although Maryland has only a permissive, not compulsory, counterclaim rule, *see* Md. Rule 2–331; *Fairfax Savings, F.S.B. v. Kris Jen Ltd. P'ship*, 338 Md. 1, 11–12, 655 A.2d 1265, 1270 (1995), defendants in negligence actions will be able increasingly to raise counterclaims for damages arising from the same injury under a comparative fault rule. Thus, in a comparative negligence scheme, it may be the case that the plaintiff or counter-defendant owes the defendant or counterplaintiff damages, and vice versa, raising the prospect of set-offs. In *Hoffman*, the Florida Supreme Court stated broadly that, in the case of a counterclaim, courts should "enter one judgment in favor of the party receiving the larger verdict, the amount of which should be the difference between the two verdicts." 280 So.2d at 439. As the Florida court later recognized (and disavowed) in *Stuyvesant Ins. Co. v. Bournazian*, 342 So.2d 471 (Fla.1976), however, a technical application of the *Hoffman* language resulted in a windfall to insurance liability carriers, as they would be responsible only for the set-off amount, and not the full damages incurred by the insured. *Id.* at 473–74. Thus, Florida applies set-offs in negligence actions only in instances where both parties are uninsured. *Id.* at 474. By contrast, some comparative negligence states ban set-offs altogether, *see, e.g.,* R.I. Gen. Laws § 9–20–4.1 (2011), which may result in practical difficulties where only one party is uninsured. *See* John M. Rogers & Randy Donald Shaw, *A Comparative Negligence Checklist to Avoid Future Unnecessary Litigation*, 72 Kentucky L.J. 25, 73–79 (1983). Although we cannot decide definitively today how set-offs will operate in a comparative fault system, as appropriate cases work their way to us, lower courts should consider the just compensation of the parties in determining whether set-offs should apply.

I acknowledge that adopting a system of pure comparative fault implicates numerous related doctrines and principles in the law of torts, and a decision to do so is not taken lightly. That many questions will result from such a shift is not, however, a justification for retaining the status quo of contributory negligence. I have confidence that our judicial system will not be thrown into disarray, as Respondent and its Amici contend, based on the experience of, at a minimum, the twelve states that adopted judicially comparative negligence. The collateral issues will be handled readily by our Legislature and/or State's judges until this Court is presented the opportunity to resolve each lingering question.

### V. Implementation of Pure Comparative Fault Should Apply Prospectively

The final decision to undertake in the present case, as I see it, is whether the decision adopting the doctrine of comparative negligence should be applied prospectively or retrospectively (to some extent). I would apply the doctrine of selective prospectivity, which is the "method by which 'a court may apply a new rule in the case in which it is pronounced, then return to the old one with respect to all others arising on facts predating the pronouncement.'" *Polakoff v. Turner*, 385 Md. 467, 486, 869 A.2d 837, 849 (2005)(quoting *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 537, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991)(plurality opinion)).

Selective prospectivity applies generally in cases where we announce a change in the substantive common law, *Polakoff*, 385 Md. at 488 n. 14, 869 A.2d at 850 n. 14, rather than in cases changing procedural requirements in the trial courts, *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 470, 601 A.2d 633, 657–58 (1992), or overruling prior cases based on their erroneous interpretation of the law. *See Polakoff*, 385 Md. at 488, 869 A.2d at 850 (noting that a new interpretation of a statute will apply to "the case before the court and to all cases pending where the issue has been preserved for appellate review"); *Houghton v. Cnty. Comm'rs of Kent Cnty.*, 307 Md. 216, 220, 513 A.2d 291, 293 (1986) ("[T]he question of whether a particular judicial decision should be applied prospectively or

retroactively, depends in the first instance on whether or not the decision overrules prior law and declares a new principle of law."). In adopting comparative fault, this Court would "exercise[ ][its] constitutional authority to change the common law." *See Zenobia*, 325 Md. at 469, 601 A.2d at 657. *See, e.g., Tracey*, 427 Md. at 639–42, 50 A.3d at 1081–83; *Julian*, 320 Md. at 9–11, 575 A.2d at 739; *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 140, 497 A.2d 1143, 1150–51 (1985); *Boblitz*, 296 Md. at 273–75, 462 A.2d at 521–22. Unlike in *Zenobia*, where we adopted a standard of clear and convincing evidence to justify punitive damages in tort cases, 325 Md. at 469, 601 A.2d at 657, the doctrine of comparative fault is not a procedural rule. *See Erie Ins. Exchange v. Heffernan*, 399 Md. 598, 635, 925 A.2d 636, 658 (2007) (noting that the doctrine of contributory negligence relates to substantive tort law). Thus, because "[o]rdinarily decisions which change the common law apply prospectively, as well as to the litigants before the court," [32] *Julian*, 320 Md. at 10, 575 A.2d at 739 (citing *Williams v. State*, 292 Md. 201, 217, 438 A.2d 1301, 1309 (1981)), I would apply the doctrine of comparative negligence to all causes of action accruing subsequent to the filing of this opinion, and to the parties in the present case on remand. *See Boblitz*, 296 Md. at 275, 462 A.2d at 522.

---

**32.** Although we recognize that the doctrine of selective prospectivity may be criticized as treating similarly situated litigants inequitably, as we recognized in *Julian*, the reasons for doing so are "well stated, though in a slightly different context, by Justice Brennan . . . :

Sound policies of decision-making, rooted in the command of Article III of the Constitution that we resolve issues solely in concrete cases or controversies, and in the possible effect upon the incentive of counsel to advance contentions requiring a change in the law, militate against denying [these litigants] the benefit of today's decisions. Inequity arguably results from according the benefit of a new rule to the parties in the case in which it is announced but not to other litigants similarly situated in the trial or appellate process who have raised the same issue. But we regard the fact that the parties involved are chance beneficiaries as an insignificant cost for adherence to sound principles of decision-making."

*Julian*, 320 Md. at 13, 575 A.2d at 741 (quoting *Stovall v. Denno*, 388 U.S. 293, 301, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)) (alterations in original).

Finally, I would dismiss the writ of *certiorari* issued in response to the cross-petition filed by the Soccer Association of Columbia, for the same reasons stated for a similar result in the Majority opinion. *See* Maj. op. at 685 n. 3, 69 A.3d at 1152 n. 3.

C.J. Bell has authorized me to state he joins in this opinion.

GREENE, J., concurring, which BATTAGLIA, McDONALD and RAKER, JJ., join.

I join the majority opinion in rejecting Petitioner's invitation to change Maryland common law and abrogate the doctrine of contributory negligence. I write separately to explain why I believe, in addition to the reasons advanced in the majority opinion, we should defer to the General Assembly with regard to what would amount to a comprehensive revision of the law in this State. Notably, there is no dispute about whether this Court has the authority to change the common law. Just because we have that power, however, is no good reason to change the law in the face of clear policy reasons, based upon our jurisprudence, directing that we exercise restraint.

We pointed out in *Harrison v. Montgomery Cnty. Bd. of Educ.*, 295 Md. 442, 463, 456 A.2d 894, 905 (1983), that "the contributory negligence principle [is] the valid standard in Maryland negligence cases and that 'any change in the established doctrine [was for] the Legislature.'" Majority Opinion, at 685, 69 A.3d at 1152. In support of this conclusion, we acknowledged that the determination of public policy is generally a legislative prerogative. *See Harrison*, 295 Md. at 460, 456 A.2d at 903 ("[The] declaration of the public policy of Maryland is normally the function of the General Assembly[.]"). This Court has stated that "[we are] reluctant to alter a common law rule in the face of indications that to do so would be contrary to the public policy of this State." *Harrison*, 295 Md. at 460, 456 A.2d at 903 (citing *Condore v. Prince George's Cnty.*, 289 Md. 516, 532, 425 A.2d 1011, 1019 (1981)). In my view, this is sound public policy, especially in light of the long-standing adherence in this State to the rule of contributory negligence. Therefore, we should defer to the

General Assembly under the circumstances of this case. To do otherwise, we cast ourselves as a Court attempting to impose our will upon the General Assembly.

In Maryland, we operate under a fault-based tort system. Fault also is the test for liability under contributory negligence and comparative negligence. In any given case, the negligence of a plaintiff may play a part in causing his or her injuries and the damages he or she is allowed to recover should, therefore, be diminished to some extent. Of course, contributory negligence completely bars recovery, while comparative negligence prevents the plaintiff from recovering only that portion of his damages for which he is responsible. I am willing to concede that a system premised on comparative negligence for apportioning fault appears to be "a more equitable system of determining liability and a more socially desirable method of loss distribution." *See Hoffman v. Jones*, 280 So.2d 431, 437 (Fla.1973). Thus, under comparative negligence, losses are apportioned among those whose fault contributed to the occurrence. Hence, if we were writing on a clean slate, I might be persuaded to adopt the comparative negligence standard.

Because I would prefer a system of comparative negligence is neither the test nor the justification for abandoning contributory negligence and adopting comparative negligence in its place. In this case our duty is to construe or interpret the law. It is not our task to invade the province of the General Assembly and enact into law a sweeping revision of an established rule of law. Here the dissenting opinion advocates for a system of pure comparative negligence. Some might, however, prefer a system of modified comparative negligence because of a belief that a plaintiff who was more than 50% at fault should not be entitled to any recovery. Whether Maryland becomes a pure comparative negligence state or a modified comparative negligence state should not be decided by this Court on the basis of the record before us. The General Assembly, in my view, is best suited to make that determination given the current status of our laws and its ability to conduct a comprehensive study of how the changes in the law

will affect tort liability and insurance law in Maryland. In addition, as the dissenting opinion concedes, any change of the common law would not affect those statutes in Maryland that have enacted the concept of contributory negligence as a matter of law in some situations. See Dissenting Opinion, at 729–31, 69 A.3d at 1179–80.

Lastly, the General Assembly seems to be in the better position to study and resolve:

1. How comparative negligence will apply in cases of multi-tortfeasors?

2. What will be the impact on the doctrine of joint and several liability if comparative negligence becomes the law?

3. How or should the Uniform Contribution Among Tort-Feasors Act retain any viability?

4. If the last clear chance doctrine is abolished as a result of comparative negligence, should or would the doctrine of assumption of the risk also be abolished?

5. Should Maryland adopt pure comparative negligence or a modified version?

See *McIntyre v. Balentine*, 833 S.W.2d 52, 57–58 (Tenn.1992). To be certain, the General Assembly is at liberty to consider the opinions of this Court and decide whether to conduct such studies. In my view, the General Assembly may be poised to engage in such a discussion in light of the differing views expressed in this opinion. We would be wise, however, to encourage the General Assembly to do so, rather than to attempt to force it to do so by adopting the doctrine of pure comparative negligence.

I am authorized to state that Judges Battaglia, McDonald and Raker join in the views expressed in this concurring opinion.